ORIGINAL

Michael J. Green (HI Bar No. 4451)
841 Bishop Street, Suite 2201
Honolulu, HI 96813
Telephone:  808-521-3336
Facsimile:  808-566-0347
Email:  michaeljgreen@hawaii.rr.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 12 2011

at___o'clock and___min.___M.
SUE BEITIA, CLERK

Nicholas C. Yost  (CA Bar No. 35297) [pro hac vice application pending]
Matthew G. Adams (CA Bar No. 229021) [pro hac vice application pending]
SNR Denton US LLP
525 Market Street, 26th Floor
San Francisco, CA  94105
Telephone:  415-882-5000
Facsimile:  415-882-0300
Email:  nicholas.yost@snrdenton.com
        matthew.adams@snrdenton.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HONOLULUTRAFFIC.COM; CLIFF SLATER; BENJAMIN J. CAYETANO; WALTER HEEN; HAWAII'S THOUSAND FRIENDS; THE SMALL BUSINESS HAWAII ENTREPRENEURIAL EDUCATION FOUNDATION; RANDALL W. ROTH; and DR. MICHAEL UECHI,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL TRANSIT ADMINISTRATION; LESLIE ROGERS,  in his official capacity as Federal Transit Administration Regional Administrator; PETER M. ROGOFF, in his official capacity as Federal Transit | No. CV11 00307 LEK RLP<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

Administration Administrator;
UNITED STATES
DEPARTMENT OF
TRANSPORTATION; RAY
LAHOOD, in his official capacity
as Secretary of Transportation;
THE CITY AND COUNTY OF
HONOLULU; WAYNE
YOSHIOKA, in his official
capacity as Director of the City
and County of Honolulu
Department of Transportation.

      Defendants.

**INTRODUCTION**

1.     This is an action to compel Defendants to comply with the National Environmental Policy Act ("NEPA"), with Section 4(f) of the Department of Transportation Act ("Section 4(f)"), with the National Historic Preservation Act (the "NHPA"), and with the regulations and guidance implementing those statutes.  Specifically, Plaintiffs seek declaratory and injunctive relief to ensure that Defendants do not implement the Honolulu High-Capacity Transit Corridor Project ("Project") — an expensive, elevated railroad acknowledged by all parties to have significant negative impacts on historic and cultural resources, parks, schools, views, and public safety *without* materially improving current traffic conditions — before complying fully with federal environmental laws. The Project will have an adverse impact on at least 32 historic resources, such as the Chinatown Historic District, the Merchant Street Historic District, the Pearl Harbor National Historic Landmark, the National Historic Landmark at the Pacific Fleet Headquarters, the Aloha Tower, the Dillingham Building, eight historic bridges and four parks.  On information and belief — the FTA having failed to complete its required historic resource inventory and analysis before approving the Project — the Project will also result in the unnecessary disruption of numerous Native Hawaiian burial sites.  In addition, the Project will significantly interfere with protected views and take land from parks and schools.

## JURISDICTION AND VENUE

2.     Plaintiffs seek judicial review pursuant to Chapter 7 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and Section 305 of the NHPA, 16 U.S.C. § 470w-4.

3.     The court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (original jurisdiction over mandamus action to compel agency performance of duty).

4.     Venue is proper in the District of Hawaii under 28 U.S.C. § 1391(e) because a substantial part of the events and property giving rise to the action are in Hawaii and because Plaintiffs reside in Hawaii.

5.     The court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.     Defendants have taken final agency action and there exists an actual, justiciable controversy between Plaintiffs and Defendants.

## PLAINTIFFS

7.     HonoluluTraffic.com is a Hawaii non-profit corporation.  Its mission is to be a public watchdog for transportation issues, to foster discussion of cost-effective solutions for traffic problems, and to advocate solutions for traffic congestion that do not ruin the ambiance of downtown Honolulu. Honolulutraffic.com's members are concerned about the environmental and other impacts of the Project, and have actively participated in all stages of the environmental review process for the Project.  Among other things,

HonoluluTraffic.com and its members have participated in the process of identifying, developing, and evaluating the potential impacts of the Project and of identifying alternative means of reducing traffic congestion in and near Honolulu; they have commented on every publicly-available document for the Project. Although Honolulutraffic.com and its members have through the NEPA comment process suggested a number of reasonable alternatives to the Project, Defendants refused to consider those alternatives in detail in the Final Environmental Impact Statement for the Project (the "FEIS"). Members of Honolulutraffic.com reside in Honolulu and throughout Oahu, and they enjoy the environmental, aesthetic, historic, and cultural resources found there, including the natural, recreational, and historic resources found along and near the proposed path of the Project. Those resources will be directly, indirectly, and cumulatively affected by the Project, thereby harming Honolulutraffic.com and its members.

8.    Plaintiff Cliff Slater is the Chair of Honolulutraffic.com. He has also been personally involved in the Project, writing numerous news columns and making several public speeches on the subject. Mr. Slater enjoys the views and historic resources found in downtown Honolulu, and is concerned that the Project will destroy them.

9.    Plaintiff Benjamin J. Cayetano served as the Governor of the State of Hawaii from 1994 to 2002. Prior to that, he served in the Hawaii House of Representatives (where he chaired the Transportation and Planning Committee

from 1974 to 1978) and in the Hawaii Senate (where he chaired the
Transportation Committee from 1984 to 1986). He also served as Lieutenant
Governor of the State of Hawaii from 1986 to 1994. Governor Cayetano spends
a significant amount of time in downtown Honolulu, and he enjoys the views,
ambiance, and historic qualities of that area. He also spends a considerable
amount of time on Halekauwila Street and enjoys its aesthetic appearance. He
plans to continue visiting both downtown Honolulu and Halekauwila Street in
the future. Governor Cayetano is concerned that the Project will significantly
impair the views and aesthetics of the downtown Honolulu area and of
Halekauwila Street and will ruin his enjoyment of both districts.

10.     Plaintiff Walter Meheula Heen was born in Honolulu and is 62.5%
Native Hawaiian. He earned a law degree from the Georgetown University Law
Center. He has been a Territorial and State Representative and Senator, and
Chair on the City Council of Honolulu. During his service as a state legislator,
he actively participated in the enactment of the State's Land Use Law, which is
designed to protect agricultural land and the environment. As a member of the
City Council, he was active in discussions with Federal officials and the City
administration to initiate planning for a public transportation system to serve
Honolulu's growing population. He has served as a Hawaii State Judge and
retired from the Intermediate Court of Appeals. He was also a United States
Attorney and U.S. District Court Judge. Most recently, he served a term as
Trustee of the Office of Hawaiian Affairs ("OHA"). Having lived his entire life

in Honolulu, participated in numerous government decisions as indicated above, and traveled to all points of the island, he is extremely apprehensive and concerned that the proposed "heavy rail" system will be utterly destructive of the environment along and within view of the proposed route. As a Native Hawaiian he is also concerned that construction along the system's entire route will cause serious disturbance to places of importance to his native culture, including unforeseen burial sites. He was a member of the OHA board when it presented comments on the DEIS that were critical of the proposed treatment of the issue of Native Hawaiian burials.

11. Plaintiff Hawaii's Thousand Friends ("HTF") is a private Hawaii non-profit corporation with members located in the State of Hawaii and elsewhere. HTF was formed in 1981 for the purposes of ensuring that growth and development in Hawaii are reasonable and responsible, that appropriate planning, management and land and water use decisions are made that protect the environment, human health and cultural and natural resources of the State of Hawaii, and that decisions are made and proposals are implemented in conformity with the law. HTF's members use and enjoy the lands and historic sites which will be adversely affected by the construction of the Project. In addition, HTF's membership includes Native Hawaiians having an interest in the protection and preservation of Native Hawaiian burial sites that will be adversely affected by construction of the Project.

12. Plaintiff The Small Business Hawaii Entrepreneurial Education

Foundation ("SBH Foundation") is a private, non-profit organization whose mission is to promote and provide entrepreneurial information, training, and education through publications, radio and television, public meetings, conferences, seminars, social media and an interactive website in Hawaii. The SBH Foundation identifies projects and activities within the State of Hawaii that are beneficial to the enhancement of a positive business, investment and environmental climate that leads to the creation, expansion, and success of business and entrepreneurial activities. The Foundation also examines and provides analysis and research on those issues, policies and legislative actions, both direct and indirect, that could prove to be detrimental to an entrepreneurial spirit and increased economic standard of living for all residents in Hawaii. SBH Foundation members feel strongly that the oppressive nature of an elevated, heavy rail system would be not only be detrimental to the open, airy feeling that is part of Honolulu's ambience but also will be detrimental to the quality of the environment, which forms the basis for the tourism industry on which members' incomes are based.

13.     Plaintiff Randall W. Roth has been a member of the faculty at the University of Hawaii William S. Richardson School of Law since 1982. He has also served as president of the Hawaii State Bar Association, Hawaii Justice Foundation, and Hawaii Institute for Continuing Legal Education, and as a board member of the Hawaii Society of Certified Public Accountants. Professor Roth also edited and contributed to two *Price of Paradise* books, and for five

years served as moderator of the *Price of Paradise Radio Show*.  In that
capacity, he directed public attention to vital issues such as threats to the
environment, worsening traffic congestion, corruption related to land
development, and political dysfunction.  Roth has written and
spoken publicly about government corruption, fiduciary duty, transparency, and
accountability, including an article in Honolulu Magazine entitled, *Politics in
Hawaii: Is Something Broken?*  Professor Roth personally enjoys Hawaii's
uniquely beautiful environment and feels a personal responsibility to
help protect it for future generations.  The proposed elevated heavy rail system
would harm professor Roth in several ways, including the destruction of key
view planes and significant changes in the aesthetics of the Project area.

14.   Plaintiff Michael Uechi, M.D., was born and raised in Honolulu,
and practices medicine there.  He lives in Aiea and commutes daily to Honolulu,
where he enjoys the tree-lined streets of the downtown area, and, in particular,
the historic buildings and ambiance there.  Dr. Uechi is concerned that the
construction of the Project will render traffic congestion unbearable and will
destroy the aesthetics and historic qualities of downtown Honolulu.

15.   All Plaintiffs have participated in the public process related to the
approval of the project, and all have exhausted available administrative
remedies.  And all Plaintiffs (and, in the case of the Plaintiff organizations, at
least some of their members) visit and enjoy the environment of the Project area,
including its historic and cultural aspects, its ambiance, its views, and its sense

of openness, all of which would be impaired if the Project is built.

## DEFENDANTS

16.    Defendant Federal Transit Administration ("FTA") is an operating administration within the United States Department of Transportation. The FTA served as a lead agency for the Project, and, in that capacity, was the federal entity legally responsible for ensuring compliance with NEPA, Section 4(f), the NHPA, and other federal statutes and regulations imposing substantive and procedural requirements. In purported compliance with those responsibilities, the FTA issued a Record of Decision ("ROD") for the Project.

17.    Leslie Rogers is sued in his official capacity as the Regional Administrator for Region IX of the FTA, the regional office responsible for various western states and territories, including the State of Hawaii. Mr. Rogers is identified as the signatory of the ROD.

18.    Peter Rogoff is sued in his official capacity as Administrator of the FTA. He is responsible for all FTA activities.

19.    The United States Department of Transportation ("DOT") is the parent department of the FTA, and, as such, bears overall responsibility for compliance with the laws which are the subject of this Complaint.

20.    Ray LaHood is sued in his official capacity as the Secretary of Transportation ("Secretary"). He is responsible for all Department of Transportation activities, including the activities of the FTA.

21.    The City and County of Honolulu ("City") is a consolidated City-

County government located on the island of Oahu in the State of Hawaii. The City served as a lead agency for the Project, and, in that capacity, purported to comply with NEPA, the NHPA, and Section 4(f) by preparing various economic and environmental analyses, including the EIS.

22.     Wayne Yoshioka is the Director of the City's Department of Transportation Services. On information and belief, he had direct responsibility for the City's purported compliance with NEPA, Section 4(f), and the NHPA in connection with the Project.

## THE PROJECT

23.     The Project is a 20-mile elevated heavy rail line proposed to be built from Honolulu's densely-populated, historic core to a sparsely populated, predominantly agricultural area known as Kapolei. This 20-mile rail line is but one part of a larger system of heavy rail transit; other portions of the system include elevated rail lines extending to (1) the University of Hawaii, Manoa, (2) the tourist area of Waikiki, and (3) the small community of Ewa.

24.     The primary component of the Project is an elevated concrete viaduct known as a "fixed guideway." The fixed guideway is proposed to be approximately 35 to 50 feet tall, roughly the same height as a 3- to 4-story building.

25.     The Project also includes 21 rail stations located at various points along the guideway. Each station will have at least one 240-foot platform for passenger loading and unloading. Some stations will have as many as three 240-

foot platforms.  All stations will be elevated; some will have concourses beneath the guideway, others will not.

26.     The Project also includes a number of other structures, facilities, and infrastructure, including:

- At least four transit centers (referred to in the FEIS as "facilities that accommodate transfers between fixed guideway, bus, bicycle, and walking");

- Approximately 40 acres of parking lots;

- A 44-acre vehicle maintenance and storage facility to include four buildings (totaling approximately 130,000 square feet), maintenance facilities, a vehicle wash area, a control center, and still more parking; and

- Approximately 20 "traction power stations," each of which (according to the FEIS) "will require an approximately 3,200 square-foot area to access and maintain an approximately 40-foot long, 16-foot-wide, and 12-foot-high painted steel enclosure that houses transformers, rectifiers, batteries, and ventilation equipment."

27.     The heavy rail system will operate non-stop and year-round from 4 a.m. to midnight (with the exception of the vehicle maintenance facility, which will operate 24 hours per day).  During rush hours, a train will arrive in each direction at each station every three minutes; at most other times, trains will run

every six minutes. Trains will be capable of operating at 50 miles per hour or more. Trains are currently anticipated to be 120 to 180 feet long, though they will be capable of reaching 240 feet long.

28.   . Each train will run over, through, along and/or across a number of sensitive land uses. There are 11 schools immediately adjacent to the tracks (three of which will lose land as a result) and 35 more within one-half mile of the heavy rail line. There are 14 parks immediately adjacent to the tracks and 39 more within one-half mile. The heavy rail line will cross through at least two historic districts. And the tracks will be located just 45 or so feet from the judges' chambers in a United States courthouse.

29.   The FEIS describes the purpose of the Project as "provid[ing] high-capacity rapid transit in the highly congested east-west transportation corridor between Kapolei and U[niversity of] H[awaii] Manoa." The FEIS also identifies a series of other "needs" for the Project, one of which is to provide the "improved accessibility" necessary to promote growth in the area near Kapolei. In short, one of the goals of the Project is to induce growth in and near Kapolei.

30.   Although the stated Purpose and Need for the Project emphasizes improvements in transportation service, the Project is not actually expected to materially improve current traffic conditions. In fact, the FEIS indicates that the Project will result in long-term traffic improvements at just 5 of the 24 facilities surveyed. Traffic conditions would deteriorate at an equal number (5 of 24) of surveyed facilities.

31.     Although the Project will not have a meaningful, lasting, positive effect on traffic conditions, it will have a number of significant, negative effects on the environment.  The FEIS acknowledges that the Project will significantly interfere with protected views.  The FEIS also admits that the Project will take land from parks and schools.  And the FEIS concedes that the Project will have an adverse impact on at least 32 historic resources, including Pearl Harbor National Historic Landmark, the National Historic Landmark at the Pacific Fleet Headquarters, the Chinatown Historic District, the Merchant Street Historic District, the Aloha Tower, the Dillingham Building, eight historic bridges, and four parks.

## APPLICABLE LAW
## NATIONAL ENVIRONMENTAL POLICY ACT

32.     NEPA is our nation's "basic charter for the protection of the environment."  40 C.F.R. § 1500.1.  It establishes a national policy to "prevent or eliminate damage to the environment and biosphere."  42 U.S.C. § 4321.  The Act recognizes "the critical importance of restoring and maintaining environmental quality"; declares that the Federal government has a continuing responsibility to use "all practical means" to minimize environmental degradations; provides that it is "the continuing responsibility of the Federal Government to use all practical means…to the end that the Nation may…preserve important historic, cultural, and natural aspects of our national heritage"; and directs that "to the fullest extent possible…the policies,

regulations, and public laws of the United States shall be interpreted and administered in accordance with [these] policies..." *See* 42 U.S.C. §§ 4331(a), 4331(b)(4), 4332(1).

33.     To implement these objectives, NEPA imposes "action-forcing" requirements on federal agencies.  These requirements are designed to force agencies to "look before they leap" so that harmful environmental impacts can be — and are — avoided.

34.     Chief among NEPA's action-forcing requirements is the mandate that federal agencies prepare EISs on all "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(2)(C).  Required elements of an EIS include a description of the proposed Federal action; a detailed discussion of the proposed action's environmental consequences; and an analysis of alternatives to the proposed action (and the environmental impacts of such alternatives).  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.13, 1502.14, 1502.16.

35.     An EIS must contain a statement of the underlying "Purpose and Need" to which the federal agency is responding.  40 CFR § 1502.13.  That statement of Purpose and Need effectively delineates the range of alternatives to be studied.  If the Purpose and Need is too narrowly stated, the EIS cannot meet its obligation to evaluate and make available for public comment "all reasonable alternatives." 40 C.F.R. § 1502.14(a).

36.     The analysis of alternatives is "the heart" of an EIS.  40 C.F.R. §

1502.14.  Federal agencies have an affirmative obligation to "[r]igorously

explore and objectively evaluate *all* reasonable alternatives."  *Id.* (emphasis

added).  Reasonable alternatives "include those that are *practical* or *feasible*

from the technical and economic standpoint, rather than simply *desirable* from

the standpoint of the applicant" for a federal approval.  46 Fed. Reg. 18026,

18027 (Mar. 17, 1981) (emphasis original).  Reasonable alternatives must then

be presented together with the proposed project "in comparative form, thus

sharply defining the issues and providing a clear basis for choice among options

by the decisionmaker and the public."  40 C.F.R. § 1502.14.  These obligations

extend to "reasonable alternatives not within the jurisdiction of the lead agency."

*Id.*

37.     In evaluating the environmental impacts of "all reasonable

alternatives," federal agencies must consider each and every reasonably

foreseeable direct, indirect, and cumulative effect of a proposed action.  42

U.S.C. § 4332(2); 40 C.F.R. §§ 1502.10, 1502.14, 1502.16, 1508.7, 1508.8.

Direct effects are "caused by the action and occur at the same time and place."

40 C.F.R. § 1508.8.  Indirect effects are "caused by the action" but are "later in

time or farther removed in distance."  *Id.*  Indirect effects "may include growth

inducing effects and other effects related to induced changes in the pattern of

land use, population density or growth rate, and related effects on air and water

and other natural systems."  *Id.*  Cumulative effects refer to "the impact on the

environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

38.     The United States Supreme Court has recognized that the EIS process serves two related purposes:  The EIS ensures that federal agencies "will carefully consider significant environmental impacts," and "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 349 (1989).  Consistent with these objectives, all environmental analyses must be "available to public officials and citizens *before* decisions are made and *before* actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added).  Indeed, NEPA imposes on Federal agencies an affirmative responsibility to make sure no party takes any action that could (1) adversely impact the environment or (2) limit the Federal agency's choice of reasonable alternatives until the entire NEPA process is complete. *See* 40 C.F.R. § 1506.1(a).

39.     The Council on Environmental Quality ("CEQ") has promulgated regulations governing the implementation of NEPA (the "CEQ NEPA Regulations"). *See* 40 C.F.R. parts 1500-1508.  The CEQ NEPA Regulations are binding on all Defendants.

40.     The CEQ NEPA Regulations require each federal department and agency to adopt implementing procedures.  40 C.F.R. § 1507.3.  Defendants are bound by procedures published at 23 C.F.R. part 771 (the "DOT NEPA Regulations").  The DOT NEPA Regulations explicitly set forth a policy that "[t]o the fullest extent possible, all environmental investigations, reviews, and consultations be coordinated as a single process, and compliance with all applicable environmental requirements be reflected in the environmental review document required by this regulation."  23 C.F.R. § 771.105(a).  The DOT NEPA Regulations also establish a policy requiring that "[a]lternative courses of action be evaluated and decisions be made in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals."  23 C.F.R. § 771.105(b).

41.     23 U.S.C. § 139(c)(3) allows local governmental entities to "serve as a joint lead agency with the Department [of Transportation] for purposes of preparing any environmental document under [NEPA]" and allows such entities to "prepare any such environmental document…if the federal lead agency furnishes guidance in such preparation and independently evaluates such document and the document is approved and adopted by the Secretary prior to the Secretary taking any subsequent action or making any approval based on such document."  23 U.S.C. § 139(c).

## SECTION 4(F) OF THE DEPARTMENT OF TRANSPORTATION ACT

42.    The Department of Transportation Act ("Section 4(f)") explicitly

declares that "[i]t is the policy of the United States Government that special

effort should be made to preserve the natural beauty of the countryside and

public park and recreation lands, wildlife and waterfowl refuges, and historic

sites." 49 U.S.C. § 303(a).

43.    To implement that policy, Section 4(f) imposes substantive

restrictions on federal decisionmaking:

> "the Secretary [of Transportation] may approve a transportation
>
> program or project…requiring the use of publicly owned land
>
> of a public park…or land of an historic site of national, State, or
>
> local significance…only if -- (1) there is no prudent and
>
> feasible alternative to using that land; and (2) the program or
>
> project includes all possible planning to minimize harm to the
>
> park…or historic site resulting from the use."

49 U.S.C. § 303(b).

44.    Section 4(f) exempts *de minimis* impacts from the substantive

restriction on decisionmaking identified above; but the statute also limits the

situations in which a finding of *de minimis* impact can be made. With respect to

historic sites, a finding of *de minimis* impact is only allowed where three criteria

are satisfied:

- "[T]he Secretary [of Transportation] has determined, in accordance

with the consultation process under section 106 of the National
Historic Preservation Act…that (i) the transportation program or
project will have no adverse effect on the historic site; or (ii) there
will be no historic properties affected by the transportation
program or project";

- "[T]he finding of the Secretary [of Transportation] has received
  written concurrence from the applicable State historic preservation
  officer"; and

- "[T]he finding of the Secretary [of Transportation] has been
  developed in consultation with parties consulting as part of the
  [Section 106] process"

49 U.S.C. § 303(d)(2). With respect to parks and recreation areas, a finding of
*de minimis* impact is only allowed where two criteria are satisfied:

- "The Secretary [of Transportation] has determined, after public
  notice and opportunity for public review and comment, that the
  transportation program or project will not adversely affect the
  activities, features, and attributes of the park…eligible for
  protection"; and

- "[T]he finding of the Secretary [of Transportation] has received
  concurrence from the officials with jurisdiction over the park…"

49 U.S.C. § 303(d)(3).

45.     Defendants have promulgated regulations implementing the requirements of Section 4(f) (the "4(f) Regulations"), and Defendants are bound by those regulations. *See* 23 C.F.R. part 744.

46.     Among other things, the 4(f) Regulations address the time at which Defendants' Section 4(f) analysis must be completed: "The potential use of land from a Section 4(f) property ***shall*** be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study." 23 C.F.R. § 774.9 (emphasis added).  Moreover, "[p]rior to making Section 4(f) approvals...the 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development."  23 C.F.R. § 774.5(a).

47.     The Section 4(f) Regulations also address the format in which Defendants' Section 4(f) evaluation must appear: "for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD."  *Id.*  A Section 4(f) evaluation "***shall*** include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and ***shall*** summarize the results of all possible planning to minimize harm to the Section 4(f) property."  23 C.F.R. § 774.7(a) (emphasis added).  The "Administration shall review all Section 4(f) approvals...for legal

sufficiency" and "the documentation supporting a Section 4(f) approval should be included in the EIS..." 23 C.F.R. § 774.7(d), (f).

48.    The 4(f) Regulations specify that Section 4(f) evaluations must address both direct and constructive uses of Section 4(f) resources.  They specifically define "constructive use" as follows:

> "A constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the property are substantially diminished."

23 C.F.R. § 774.15(a).  The 4(f) Regulations also note that "the Administration has...determined that a constructive use occurs" in situations where "the location of a proposed transportation facility [is] in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building, or substantially detracts from the setting of a Section 4(f) property which derives its value in substantial part due to its setting."  23 C.F.R. § 774.15(e)(2).

49.    The Federal Highway Administration ("FHWA"), a governmental entity within Defendant United States Department of Transportation, has issued

a guidance document titled "FHWA 4(f) Policy Paper" (the "4(f) Policy Paper").

Among other things, the 4(f) Policy Paper explicitly addresses some distinctions

between the requirements of NEPA and the requirements of Section 4(f):

- "It is important to point out that the standard for evaluating alternatives under NEPA and the standard for evaluating alternatives under Section 4(f) are different."

- "[S]imply because under NEPA an alternative…is determined to be unreasonable, does not by definition [] mean that it is imprudent under the higher substantive test of Section 4(f)."

- "[I]t is possible for an alternative that was examined but dismissed during the preliminary NEPA alternative screening process to still be a feasible and prudent avoidance alternative under Section 4(f)."

50.     A memorandum dated December 13, 2005 and signed by the Associate Administrator of the FTA states that "FTA and other modal administrations generally follow the guidance" in the 4(f) Policy Paper.  The December 13, 2005 memorandum is addressed to "FTA Regional Administrators," among others.  On information and belief, the December 13, 2005 memorandum was distributed to FTA Regional Administrators with the 4(f) Policy Paper.

## THE NATIONAL HISTORIC PRESERVATION ACT

51.     In enacting the NHPA, Congress specifically declared that "the historical and cultural foundations of the Nation should be preserved as a living

part of our community life and development in order to give a sense of orientation to the American people" and, further, that "the preservation of [our] irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, esthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." 16 U.S.C. § 470(b)(2),(4).

52.     Section 106 of the NHPA requires all federal agencies to "take into account" the impact of their actions on historic properties, including sites listed on or eligible for listing on the National Register of Historic Places, and to do so "prior to" approving any action. 16 U.S.C. § 470f. Section 106 also requires that federal agencies afford another federal agency, the Advisory Council on Historic Preservation ("ACHP"), "a reasonable opportunity to comment" on their actions. *Id.*

53.     When an agency proposes to take an action that could adversely affect one or more historic properties, the agency must engage in a consultation process to "develop and evaluate alternatives or modifications to the [action] that could avoid, minimize or mitigate [any] adverse effects." 36 C.F.R. § 800.6(a). The consultation process may result in either a Memorandum of Agreement or, in "certain complex project situations or multiple undertakings," in a Programmatic Agreement. In either scenario, the agency must fulfill its Section 106 responsibilities prior to reaching a final decision on the proposed action.

54. The ACHP has promulgated regulations implementing Section 106. *See* 36 C.F.R. part 800. Those regulations are binding on Defendants. The Section 106 regulations stress the importance of considering the effects of a federal project at the earliest possible time, "so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 C.F.R. § 800.1(c). More specifically, the Section 106 regulations (1) require that NHPA review be completed "prior to" the approval of any expenditure of federal funds on a project and (2) prohibit agencies from taking any action that could "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate" damage to historic properties until the NHPA process is complete. 36 C.F.R. § 800.1.

## FACTUAL BACKGROUND

55. Beginning in the late-1990's, the City began considering the development of a rapid transit system linking the dense, historic core of Honolulu with other areas of the island of Oahu. In 2003, the City, together with the FTA, issued a Final EIS evaluating various options for rapid transit in the transportation corridor extending from Kapolei to Waikiki (the "BRT EIS"). The BRT EIS concluded that a bus rapid transit system (essentially, a system of express buses operating in dedicated lanes, with connections available to enhanced local bus service) would provide the best approach to transit within the corridor, and would create "an integrated transit system enhancing mobility within the [] corridor and between the [] corridor and other parts of [Oahu]."

The BRT EIS also concluded that the cost of a bus rapid transit system was reasonable.

56.     Although the BRT EIS endorsed a bus rapid transit system as reasonable and feasible, the City changed its focus to the development of a different transit system.  In 2005, approximately two years after the BRT EIS, the City issued a public notice advertising its intent to identify and analyze transit alternatives in the very same transportation corridor addressed in the BRT EIS.  The notice specified that the City planned to consider alternatives involving a fixed guideway.

57.     The City then undertook an "alternatives analysis" addressing, *inter alia*, a fixed guideway.  The "alternatives analysis" included a "screening" process designed to identify a range of reasonable alternatives suitable for (subsequent) consideration in an EIS.  The City memorialized its screening process in an October 24, 2006 document titled "Alternatives Screening Memo Honolulu High-Capacity Transit Corridor Project" (the "2006 Alternatives Screening Memo").  The 2006 Alternatives Screening Memo was prepared by a private consultant for the City.  Nothing in the Memo indicates it was prepared under the guidance of the FTA or that it was independently evaluated by the FTA, and Plaintiffs therefore believe that FTA did not, in fact, provide such guidance or independent evaluation while the Memo was being prepared.  Neither the FTA nor the Secretary issued any sort of formal approval or adoption of the final version of the Memo.

58.     The 2006 Alternatives Screening Memo identified several feasible alternatives for addressing transportation in and around Honolulu.  Among other things, it recommended several transit alignments, including:  (1) a tunnel beneath King Street and (2) a route following Nimitz Highway to Queen Street. The 2006 Alternatives Screening Memo also recommended ***against*** routing a fixed guideway along Nimitz Highway to Halekauwila Street, explaining  that the Nimitz-to-Halekauwila alignment "would have severe visual impacts for Aloha Tower and should be avoided if there are other viable alternatives."

59.     On November 1, 2006 — one week after the final version of the 2006 Alternatives Screening Memo — the City issued a second document titled "Honolulu High-Capacity Transit Corridor Project Alternatives Analysis Report" (the "2006 Alternatives Report").  The 2006 Alternatives Report — like the 2006 Alternatives Screening Memo — was prepared by a private consultant for the City.  Nothing in the Report indicates it was prepared under the guidance of the FTA or that it was independently evaluated by the FTA, and Plaintiffs therefore believe that FTA did not in fact provide such guidance or independent evaluation as the Report was prepared.  Neither the FTA nor the Secretary issued any sort of formal approval or adoption of the final version of the Report.

60.     The 2006 Alternatives Report noted that the King Street tunnel alignment was more expensive than the other routes considered, but did not conclude that the tunnel was infeasible, imprudent, or unreasonable.  The 2006 Alternatives Report also identified an engineering concern related to the width

of the Queen Street alignment, but (as with the King Street tunnel) the Report

did not conclude that the Queen Street alignment was infeasible, imprudent, or

unreasonable. It also noted that the Queen Street alignment is the least

expensive of the alternatives considered. The 2006 Alternatives Report did not

revisit the City's prior conclusions about the "severe" visual impact of the

Nimitz-to-Halekauwila alignment on Aloha Tower.

61.   On the basis of the 2006 Alternatives Report and the 2006

Alternatives Screening Memo, the City purported to eliminate from further

consideration several alternatives, including (1) the alternative of developing

"managed lanes" for use by buses, high-occupancy vehicles, and emergency

vehicles and (2) the alternative of optimizing bus service without constructing

major, new infrastructure.

62.   Beginning in 2007, the FTA and the City issued a formal "Notice of

Intent to Prepare an Environmental Impact Statement," thereby initiating the EIS

process for the Project.

63.   Honolulutraffic.com, among others, made comprehensive

comments in response to the joint FTA/City Notice of Intent.

Honolulutraffic.com noted that the statement of purpose and need for the Project

was overly narrow and confusing; that a "managed lanes" alternative should be

considered in the EIS for the Project; and that several other analyses and

alternatives should be included in the EIS.

64.    In 2008, the City issued a "request to prospective suppliers" of transit equipment.  The request sought various technical and cost information about a variety of different rail transit technologies.  The City then convened a panel of experts (the "2008 Panel of Experts") to review the responses to the City's request.  The 2008 Panel of Experts concluded that the technology referred to as "steel wheel on steel rail" was the most desirable technology from the City's perspective.

65.    The Panel reached that conclusion without FTA's involvement. Nevertheless, the City, in reliance on the 2008 Panel of Experts' findings, purported to eliminate from consideration in the EIS all rail technologies other than "steel wheel on steel rail."

66.    In November, 2008, the FTA and the City jointly released for public review a Draft EIS for the Project.  The Draft EIS evaluated four alternatives:  (1) a "no build" alternative; (2) a fixed guideway alignments along Salt Lake Boulevard; (3) a fixed guideway alignment to the airport; and (4) a fixed guideway alternative including both the Salt Lake and Airport alignments. Neither the King Street tunnel nor the Nimitz Highway-to-Queen Street alignment was evaluated in detail in the Draft EIS.  Nor did the Draft EIS did not evaluate in detail any alternatives to heavy rail transit (*e.g.,* managed lanes, enhanced bus service, etc.).  Nor, for that matter, did the Draft EIS consider any alternatives to "steel wheel on steel rail" technology.

67.     The Draft EIS was widely criticized for failing to address the environmental consequences of — and alternatives to — the Project. The United States Environmental Protection Agency rated the DEIS "EC-2," meaning that the DEIS did not contain sufficient information to assess significant environmental concerns about the Project. The United States Army Corps of Engineers called the analysis of alternatives in the DEIS "inadequate." Other entities critical of the DEIS included the National Park Service, the United States Navy, the General Services Administration, the Hawaii Department of Agriculture, the Hawaii Department of Education, the Hawaii Department of Natural Resources, the Office of Hawaiian Affairs, the American Institute of Architects, Hawaii's Thousand Friends, the League of Women Voters, and Honolulutraffic.com. The alternatives identified in paragraphs 74 through 118 are among the alternatives that commenters requested be considered in detail in the EIS.

68.     Honolulutraffic.com submitted extensive comments on the DEIS. Among other things, the comments addressed the fact that the Project will not result in long-term reduction of traffic congestion below current levels. The comments also noted Defendants' failure adequately to consider alternatives to the Project; Defendants' failure adequately to assess the environmental consequences of the Project; identified analytical errors in Defendants' modeling of transit ridership and traffic conditions; and noted that the DEIS

underestimated the environmental consequences of the heavy rail system as a whole by improperly segmenting its analysis.

69.   As part of its response to Honolulutraffic.com's comments on the DEIS, Defendants admitted "[y]ou are correct in pointing out that traffic congestion will be worse in the future with rail than what it is today without rail, and that is supported by the data included in the Final EIS."

70.   In June, 2010, Defendants issued a FEIS. The FEIS considered the same alternatives evaluated in the Draft EIS.   The FEIS did not meaningfully address the requests of Honolulutraffic.com (and others) that additional alternatives be considered.  Nor did it evaluate the other feasible alternatives proposed by commenters.  Nor did it correct the analytical errors identified in Honolulutraffic.com's comments on the DEIS.

71.   Honolulutraffic.com and others submitted comments on the FEIS. Honolulutraffic.com's comments again suggested that additional feasible alternatives be considered, including an alternative based on the development of a series of managed lanes for buses, high-occupancy vehicles ("HOVs"), and emergency vehicles.  Alternative  formulations included reserving the lanes for eastbound traffic during the morning and westbound traffic during the evening as well as varying access for HOVs depending on traffic conditions.  This alternative would have included an elevated roadway west of downtown Honolulu, but would not have included such an elevated roadway through downtown Honolulu and the historic districts in that vicinity.  Among others

things, Honolulutraffic.com pointed out that the City's prior consideration of alternatives involving managed lanes arbitrarily and capriciously assumed that the development of such lanes required removal of existing lanes of traffic (thereby skewing the City's analysis). Honolulutraffic.com also noted that the City's cost estimates for a managed lane alternative are inaccurate and therefore skewed the analysis.

72.    In January, 2011, Defendants, together with other consulting parties, executed a Programmatic Agreement ("PA") in purported compliance with the NHPA. The Programmatic Agreement assigned future responsibility for various preservation-related tasks. Those tasks include the requirement that an archeological survey of the Project area be completed at some future time. The Programmatic Agreement failed to address the possibility that the Project will indirectly affect historic resources by inducing growth at or near rail stations.

73.    On January 18, 2011, Defendant Rogers, acting in his official capacity on behalf of Defendant FTA, executed a Record of Decision ("ROD"). The ROD does not guarantee that the Project will receive federal funding. But it allows the City to recover the costs of certain Project development activities (for example, relocation of utilities, acquisition of real estate, etc.) should federal funding be made available. The ROD constitutes Defendants' approval of the Project and is final agency action within the meaning of the APA. The ROD did

not respond to any of the points raised in Honolulutraffic.com's comments on the FEIS.

## VIOLATIONS OF LAW

## COUNT 1:  DEFINING THE PURPOSE AND NEED SO NARROWLY AS TO PRECLUDE CONSIDERATION OF ALL REASONABLE ALTERNATIVES (NEPA)

74.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 73 above and 78 through 123 below.

75.     NEPA requires that the EIS specify the underlying Purpose and Need to which the agency is responding in proposing the alternative including the proposed action.  40 C.F.R. § 1502.13.

76.     NEPA mandates that an EIS identify, evaluate, and compare "all reasonable alternatives" to a proposed project.  40 C.F.R. § 1502.14.  The CEQ NEPA Regulations explicitly state that the analysis of alternatives is the "heart" of an environmental impact statement.  *Id.*

77.     Defendants violated NEPA's requirements governing the analysis of alternatives by defining the Purpose and Need for the Project so narrowly as to preclude consideration of a reasonable range of alternatives.  For example:

- The FEIS describes the purpose of the Project as "to provide high-capacity rapid transit" consisting of "public transportation" in a single, specific "transportation corridor"  (as opposed to "alleviating traffic congestion," or "moving people from X to Y.").

- The FEIS also specifies that the Project is not to involve buses

operating on existing streets and must provide "an alternative to
private automobile travel."

- The FEIS further specifies that the Project is required to serve
  certain specific "areas designated for urban growth."

By defining the Project's purpose and need in such a narrow manner,
Defendants unreasonably, arbitrarily, and capriciously restricted their
consideration of alternative means of improving the transportation corridor to a
narrow range of "alternatives" essentially identical to the Project.  And, in so
doing, they improperly restricted the scope of the entire FEIS.

## COUNT 2:  FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES (NEPA)

78.    Plaintiffs repeat and incorporate the allegations contained in
paragraphs 1 through 77 above and 86 through 123 below.

79.    Defendants also violated NEPA's requirements governing the
analysis of alternatives by arbitrarily and capriciously eliminating from
consideration reasonable alternatives to developing a new rail system.

- The 2006 Alternatives Report and the 2006 Alternatives Screening
  Memo identify several potentially-feasible means of improving the
  transportation corridor without developing a new rail system; prior
  to the release of the Draft EIS, however, the City purported to
  eliminate from consideration all non-rail alternatives, concluding
  that developing a new rail system was the only feasible means of

achieving the Project's objectives.

- One of the alternatives eliminated from consideration in the EIS
  was the construction of a system of new "managed lanes" to be
  used by buses, high-occupancy vehicles, emergency vehicles, and,
  conditions permitting, vehicles willing to pay a toll in order to
  avoid traffic.

- The decision to eliminate from consideration the alternative of
  "managed lanes" was arbitrary and capricious in that it was based
  on inaccurate data about the cost and environmental consequences
  of such lanes.

- The decision to exclude the alternative of "managed lanes" from
  the EIS was also arbitrary and capricious in that it ignored
  "managed lanes" proposals from both Honolulutraffic.com and the
  League of Women Voters.

For these reasons, Defendants' failure to consider in the EIS alternatives to the
development of a rail system was arbitrary and capricious.

80.    In addition, Defendants violated NEPA's requirements governing
the analysis of alternatives by arbitrarily and capriciously eliminating from
consideration reasonable alternatives to the specific rail technology (referred to
in the FEIS as "steel wheel on steel rail") that will be used by the Project.

- The 2006 Alternatives Report and the 2006 Alternatives Screening
  Memo identified multiple rail technologies that could feasibly meet

the Project's purposes and needs, including light rail, steel wheel on steel rail, rubber-tired guided vehicles, magnetic levitation systems, and monorails.

- The City's 2008 Panel of Experts purported to eliminate from further consideration light rail, rubber-tired guided vehicles, magnetic levitation systems, and monorails (leaving only steel wheel on steel rail).

- In doing so, the 2008 Panel of Experts considered performance, cost, and reliability; it did not consider the environmental advantages and disadvantages of the different technologies.

- Multiple commenters on the DEIS requested that Defendants consider in detail the alternative of using one or more of the technologies purported to have been eliminated from consideration by the 2008 Panel of Experts; among other things, these commenters noted that technologies such as monorail have smaller footprints (and therefore fewer environmental impacts) than the "steel wheel on steel rail" technology analyzed in the EIS.

- The United States Environmental Protection Agency submitted comments on the Draft EIS in which it requested that Defendants consider in detail the alternative of using light rail technology.

- The FEIS states that the 2008 Panel of Experts "resulted in the City establishing steel wheel operating on steel rail as the technology to

be evaluated for the Project."

For these reasons, Defendants' failure to consider in the EIS alternatives to "steel wheel on steel rail" was arbitrary and capricious.

81.     Furthermore, Defendants violated NEPA's requirements governing the analysis of alternatives by arbitrarily and capriciously eliminating from consideration reasonable alternatives to the alignment (or route) of the Project.

- The FTA claims that more than 75 potential alignments for the project were considered; however, the FEIS presents just two (identified as the "Airport" alignment and the "Salt Lake" alignment).

- The 2006 Alternatives Report and the 2006 Alternatives Screening Memo identified multiple potentially-feasible alignments through the downtown area of Honolulu, where the question of alignment is particularly sensitive.

- Among the feasible downtown alignments identified in the 2006 Alternatives report and the 2006 Alternatives Screening Memo are (1) an above-ground alignment running along Nimitz Highway to Queen Street and (2) a below-ground route beneath King Street.

- The 2006 Alternatives Report and the 2006 Alternatives Screening Memo also addressed an alignment running along Nimitz Highway to Halekauwila Street. The 2006 Alternatives Screening Memo concluded that such an alignment "would have severe visual

impacts for Aloha Tower and should be avoided if there are other

viable alternatives."

- Notwithstanding the 2006 Alternatives Screening Memo, the EIS

    evaluates in detail only the Nimitz Highway to Halekauwila Street

    alignment through downtown Honolulu, and not the Nimitz

    Highway to Queen Street alignment or the below-ground route

    beneath King Street.

- The EIS also failed to consider an alignment in which the elevated

    fixed guideway would not cross downtown Honolulu, but rather

    would begin west of downtown and its historic sites (allowing

    other transportation improvements to be made downtown).

For these reasons, Defendants' failure to consider in the EIS reasonable

alternatives to the alignment of the Project was arbitrary and capricious.

82.    Moreover, Defendants violated NEPA's requirements governing

the analysis of alternatives by arbitrarily and capriciously refusing to identify or

consider reasonable alternatives that would require further action by the

Honolulu City Council.

- The Nimitz Highway to Halekauwila Street alignment through

    downtown Honolulu (the only downtown alignment in the Project)

    requires that the Project be built within 45 feet of the third- and

    fourth-floor windows of the federal office building in which the

    United States District Court for the District of Hawaii is located,

raising significant concerns about public safety, the possibility of terrorism, and excessive noise, vibration, and construction-related impacts.

- Ignoring these concerns, neither the city nor Defendants provided the General Services Administration (manager of the building), the District Court (located in the building), or the United States Marshal (responsible for security at the site) with advance notice of the Project or its alignment.

- Eight of the nine federal judges then sitting in the District Court for the District of Hawaii (joined by the United States Marshal for the District of Hawaii) submitted a letter requesting that Defendants consider alternatives to the Nimitz Highway to Halekauwila Street alignment.

- Among other things, the letter reports a conversation between the judges and the Chief of the City's Rapid Transit Division in which the City took the position that alternatives to the Nimitz Highway to Halekauwila Street alignment were unlikely to be considered because such alternatives would require the approval of the Honolulu City Council.

- As noted above, Defendants' obligation to consider all reasonable alternatives extends to "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14.(c).

For these reasons, Defendants' refusal to identify or consider reasonable alternatives that would require further action by the Honolulu City Council was arbitrary and capricious.

83.     Defendants also violated NEPA's requirements governing the analysis of alternatives by arbitrarily and capriciously relying on the City's 2006 Alternatives Report and 2006 Alternatives Screening Memo as bases for eliminating from consideration reasonable alternatives in a manner not authorized by law.

- The 2006 Alternatives Report and 2006 Alternatives Screening Memo were prepared by the City in purported compliance with and/or reliance on 49 U.S.C. § 5309. *See* FEIS at 2-2 to 2-3.

- The requirements of 49 U.S.C. § 5309 are not equivalent to the requirements of NEPA and do not relieve the agency's responsibilities under NEPA, and neither the 2006 Alternatives Report nor the 2006 Alternatives Screening Memo in fact satisfies NEPA's requirements governing the analysis of alternatives in an EIS.

- The 2006 Alternatives Report and 2006 Alternatives Screening Memo arbitrarily and capriciously purport to eliminate from consideration a number of reasonable alternatives by relying on inaccurate data, by failing

accurately to describe the environmental consequences of the alternatives considered, and because the data and information on which both documents rely was not made available for public review.

- Although the FEIS suggests that the 2006 Alternatives Report and 2006 Alternatives Screening Memo were subject to public review and comment, neither the City nor Defendants ever responded to those comments.

- No Federal agency specifically approved the 2006 Alternatives Report or the 2006 Alternatives Screening Memo.

- The 2006 Alternatives Report and the 2006 Alternatives Screening Memo were not properly incorporated by reference into the DEIS or the FEIS.

- 23 U.S.C. § 139(c)(3) provides that under certain conditions a local agency my prepare an environmental document required by NEPA "if the Federal lead agency furnishes guidance in such preparation and independently evaluates such document . . . ." Neither the Analysis nor the Memo contains any assertion to the effect that such guidance was given by FTA or that such independent evaluation was performed by the FTA, and on

information and belief Plaintiffs therefore assert that such guidance was not given nor independent evaluation performed.

- 23 U.S.C. § 139(c)(3) also says that under certain conditions a local agency may prepare an environmental document required by NEPA if "such document is approved and adopted by the Secretary prior to the Secretary's taking any subsequent action or making any approval based on such document . . . ." Neither the Analysis nor the Memo contains any assertion to the effect that such approval and adoption by the Secretary took place, and on information and belief Plaintiffs assert such approval and adoption by the Secretary did not occur.

For these reasons, Defendants' reliance on the City's 2006 Alternatives Report and 2006 Alternatives Screening Memo as bases for eliminating from consideration reasonable alternatives was arbitrary and capricious.

84.    Defendants also violated NEPA's requirements governing the analysis of alternatives by arbitrarily and capriciously relying on the City's 2008 Panel of Experts as a basis for eliminating from consideration reasonable alternatives.

- The 2008 Panel of Experts arbitrarily and capriciously

purport to eliminate from consideration a number of
reasonable alternatives by relying on inaccurate data, by
failing accurately to describe the environmental
consequences of the alternatives considered, and because
the data and information on which both documents rely
was not made available for public review.

- Although the FEIS suggests that the work of the 2008
  Panel of Experts was subject to public review and
  comment, neither the City nor Defendants ever
  responded to those comments.

- Nothing in the report of the Panel of Experts contains any
  assertion to the effect that the Panel acted under the
  guidance of the FTA or that the FTA independently
  evaluated the Panel's work and on information and belief
  Plaintiffs therefore assert that such guidance was not
  given nor independent evaluation performed.

- The proceedings of the 2008 Panel of Experts were not
  properly incorporated by reference into the DEIS or the
  FEIS.

For these reasons, Defendants' reliance on the City's 2008 Panel of Experts as a
basis for eliminating from consideration reasonable alternatives was arbitrary
and capricious.

85.     As a result of the above-described violations of NEPA's requirements governing the analysis of alternatives, Defendants failed properly to consider "all reasonable alternatives." *See* 40 C.F.R. § 1502.14. Reasonable alternatives excluded from proper consideration include, but are not limited to, the following:

- Alternatives that would implement the bus rapid transit system evaluated in the BRT EIS (or a variation of that system).

- Alternatives that would place a fixed guideway underground through the downtown area of Honolulu, thereby avoiding impacts on noise, historic resources, and the visual environment. Several commenters on the DEIS, including the American Institute of Architects Honolulu Chapter, submitted comments on the Draft EIS proposing such alternatives, and both the 2006 Alternatives Report and the 2006 Alternatives Screening Memo concluded that a tunnel on King Street was feasible.

- Alternatives that would place an elevated fixed guideway along Queen Street (rather than Halekauwila Street), thereby avoiding significant impacts on a number of historic resources, including Aloha Tower. Although the

2006 Alternatives Report and the 2006 Alternatives Screening Memo concluded that a Queen Street alignment would be feasible and environmentally-desirable, no alternatives using such an alignment were considered in the FEIS.

- Alternatives that would develop a system of managed lanes *without* eliminating existing high-occupancy vehicle lanes, thereby avoiding many of the costs and environmental impacts associated with building a new fixed guideway structure through across the entire length of the transportation corridor. Plaintiff Honolulutraffic.com requested further study of such alternatives, as did the League of Women Voters.

- Alternatives such as a managed lane alternative which would not include an elevated roadway passing through many of the most historic and culturally significant sites in and near downtown Honolulu.

- Alternatives that would employ technologies other than "steel wheel on steel rail" (such as monorail or light-rail systems), thereby reducing the footprint — and with it, the environmental impacts of — the Project. Several commenters on the Draft EIS, including the United States

Environmental Protection Agency, requested further

study of such alternatives.

## COUNT 3: FAILURE PROPERLY TO ANALYZE THE ENVIRONMENTAL CONSEQUENCES OF ALTERNATIVES (NEPA)

86.     Plaintiffs repeat and incorporate the allegations contained in

paragraphs 1 through 85 above and 94 through 123 below.

87.     NEPA mandates that federal agencies, including Defendants,

"present the environmental impacts of [] proposal[s] and alternatives in

comparative form, thus sharply defining the issues and providing a clear basis

for choice among options by the decisionmaker and the public." 40 C.F.R. §

1502.14.  This evaluation of environmental impacts must address all reasonably

foreseeable direct, indirect, and cumulative environmental consequences of the

proposed federal action.  40 C.F.R. § 1502.16.

88.     Defendants violated NEPA by applying inaccurate, arbitrary and

capricious ridership data and projections to the Project.  Ridership estimates

form the underpinning of the environmental analysis in the FEIS; without an

accurate estimate of how many people will use the proposed rail system, it is not

possible to determine the environmental consequences of the proposed rail

system or to compare those consequences to the consequences of other

alternatives.

89.     The FEIS fails properly to account for environmental impacts

associated with the construction of the Project.  In particular, the FEIS does not

account for the potential impacts on air quality, traffic, and water quality associated with the building materials that will be needed for the Project or the transportation of those materials to the Project site, or the disruption of known and unknown utility lines and other infrastructure.

90.     The FEIS fails properly to address the visual impacts of the Project. In particular, Defendants have arbitrarily and capriciously failed properly to account for impacts on views of historic and architecturally-significant structures such as the Aloha Tower.

91.     The FEIS fails properly to address both the impacts of the Project on climate change and the implications of climate change for the Project, including the effect of potential sea-level rise on the Project.

92.     The FEIS fails properly to address the potential impacts of the Project on historic, cultural, and archeological resources.  The FEIS recognizes that the Project will traverse areas likely to contain Native Hawaiian burial sites and/or Traditional Cultural Properties, but Defendants have deferred their analysis of these resources until construction of the Project begins.  In other words:  Dig first, and then worry about locating burial sites.

93.     The FEIS fails properly to evaluate the indirect and cumulative impacts of the Project.  The FEIS admits that the Project "will influence the distribution, rate, density, and pace of land use development in the study corridor" and specifically notes that the Project "may increase the rate of development in the Ewa Plain" and that the Project "will likely attract" Transit-

Supportive Development, which includes "office space and multi-story residential buildings near transit stations." But the FEIS does not actually evaluate the environmental consequences of these foreseeable development activities. Among other things, it fails to address the consequences of induced development on biological resources, visual resources, air quality, water quality, traffic, utilities, public services, and historic and cultural resources.

### COUNT 4:  IMPROPER SEGMENTATION
### (NEPA)

94.    Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 93 above and 97 through 123 below.

95.    Federal agencies must examine the whole of a proposed action in any EIS, and may not "segment" the action into parts so as to avoid or minimize the environmental effects of the whole action. 42 U.S.C. § 4332(2)(C). "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action *shall* be evaluated in a single impact statement." 40 CFR § 1502.4(a) (emphasis added).

96.    The FEIS improperly segments Defendants' analysis of the environmental consequences of developing a rail system in the entire study corridor. The FEIS evaluates (and the ROD approves) immediate development of a rail system covering approximately 20 miles of the 23-mile "Honolulu High-Capacity Transit Corridor." But at least three additional rail lines are currently planned within that corridor. And at least two of those additional lines — those connecting the Ala Moana Center to the University of Hawaii, Manoa

and to Waikiki — have already been the subject of formal proposals and detailed economic, environmental, and engineering studies.  In fact, the 2006 Alternatives Report and the 2006 Alternatives Screening Memo consider both of those lines to be part of the Project.  In short, construction of the University of Hawaii, Manoa and Waikiki rail lines is just as concrete and just as foreseeable as is the Project.  Accordingly, both of those lines should have been considered part of the Project for purposes of the FEIS.  They were not.  As a result, (1) the FEIS understates the environmental impacts of the rail system and (2) the ROD effectively forecloses meaningful consideration of alternative methods of linking Ewa, the University of Hawaii - Manoa, and Waikiki to other parts of Oahu.

## COUNT 5:  FAILURE TO IDENTIFY AND EVALUATE USE OF NATIVE HAWAIIAN BURIALS AND TRADITIONAL CULTURAL PROPERTIES (SECTION 4(F))

97.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 96 above and paragraphs 105 through 123 below.

98.     Section 4(f) prohibits the approval of any transportation project requiring the use of 4(f) Resources unless (1) there is no prudent and feasible alternative to using the Resources and (2) the project includes all possible planning to minimize harm to the Resources.  23 U.S.C. § 138(a); 49 U.S.C. § 303(c).  Federal regulations mandate that these issues "shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study" and require that such evaluation "include sufficient supporting documentation…"  23 C.F.R §§ 774.7, 774.9(a).

99.    The Project is a transportation project within the meaning of Section 4(f).

100.    The FEIS recognizes that the Project may affect "iwi kupuna or Native Hawaiian burials" as well as Native Hawaiian "religious or cultural artifacts."  The FEIS identifies the Kaka'Ako, Downtown, and Dillingham Boulevard sections of the Project as having "high" potential to contain Native Hawaiian burials.  Native Hawaiian burials and other archaeological resources are considered "historic properties" in the FEIS and are, in fact, historic properties or sites.

101.    The FEIS also recognizes that the Project may affect traditional cultural properties ("TCPs").  It identifies TCPs as a subset of "archaeological, cultural, and historic resources" and TCPs are, in fact, historic resources or sites.

102.    Although Hawaii's State Historic Preservation Officer explicitly recommended that Defendants evaluate "all areas of direct ground disturbance" for "archaeological resources", the FEIS admits that there has been *no* archaeological inventory survey of the entire Project route.  The ROD does not identify any archaeological inventory survey conducted after the FEIS was issued, and Defendants did not, in fact, complete an archaeological survey of the entire Project route before the ROD was executed.  On information and belief, Defendants still have not completed an archaeological survey of the entire Project route .  On information and belief, the Kaka'Ako, Downtown, and Dillingham Boulevard portions of the Project — each of which is identified in

the FEIS as highly likely to contain Native Hawaiian burials — are among the areas in which no archaeological inventory surveys have been completed.

103.   Although Hawaii's State Historic Preservation Officer explicitly recommended that the FTA address "effects the proposed undertaking may have on traditional cultural properties," the FEIS does not identify or evaluate TCPs along the entire length of the Project route.  Instead, the FEIS promises that "[f]urther investigation for TCPs" will be completed sometime in the future.  The ROD does not identify any TCP investigation completed after the FEIS was issued, and Defendants did not, in fact, complete a TCP investigation for the entire Project route before the ROD was executed.  On information and belief, Defendants still have not completed an "investigation for TCPs" for the entire Project route.

104.   Defendants' failure to identify and evaluate the Project's use of historic sites (including both Native Hawaiian burials and TCPs) prior to the execution of the ROD violates Section 4(f).

**COUNT 6:  ARBITRARY AND CAPRICIOUS EVALUATION OF THE PROJECT'S USE OF SECTION 4(F) RESOURCES (SECTION 4(F))**

105.   Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 104 above and 109 through 123 below.

106.   Section 4(f) requires that federal agencies identify and evaluate all direct, temporary, and constructive uses by a transportation project of 4(f) Resources.

107.   In purported compliance with Section 4(f), the FEIS contains an evaluation of the extent to which the Project will use certain above-ground 4(f) resources.  That evaluation is arbitrary and capricious in multiple respects:

- With respect to some 4(f) resources (including Walker Park, Irwin Park, Mother Waldron Park, Queen Street Park, United States Naval Base Pearl Harbor National Historic Landmark, Merchant Street Historic District, DOT Harbors Division Building, Pier 10/11, and Aloha Tower), the FEIS arbitrarily and capriciously concludes that the Project will not constitute a constructive use.

- With respect to other 4(f) resources (including Kehi Lagoon Beach Park, the Pacific War Memorial Site, Makalapa Navy Housing Historic District, Hawaii Employers Council, and the Tamura Building ) the FEIS arbitrarily and capriciously concludes that the Project's use will be *de minimis*.

- With respect to still other 4(f) resources (including the Merchant Street Historic District), the FEIS arbitrarily and capriciously concludes that the Project will not constitute a direct use.

108.   Defendants' arbitrary and capricious evaluation of the Project's use of 4(f) resources violates Section 4(f).

## COUNT 7:  IMPROPER PROJECT APPROVAL (SECTION 4(F))

109.   Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 108 above and 119 through 123 below.

110.   Section 4(f) prohibits the approval of any transportation project requiring the use of 4(f) resources unless (1) there is no prudent and feasible alternative to using the resources and (2) the project includes all possible planning to minimize harm to the resources.  23 U.S.C. § 138(a); 49 U.S.C. § 303(c).

111.   The FEIS, the DEIS, public comments on the DEIS, the 2006 Alternatives Report, the 2006 Alternatives Memo, and various other public documents (including public comments) identify a number of alternatives to the Project.  Some of these alternatives have never been determined to be infeasible or imprudent.

112.   Reasonable and prudent alternatives to the Project include, but are not limited to, a BRT program; the Managed Lanes Alternative evaluated in the 2006 Alternatives Screening Memo; the Managed Lanes Alternative evaluated in the 2006 Alternatives Report; the Managed Lanes alternatives suggested by Plaintiff HonoluluTraffic.com and its members; the light rail alternative proposed by the Kamehameha schools; the Pearl Harbor Tunnel; alternative fixed guideway routes, including routes making use of a tunnel beneath King Street and routes making use of Queen Street; Transportation System Management; and alternative locations for individual stations, including the downtown Honolulu station.  Each of these alternatives would have fewer impacts on 4(f) Resources than would the Project.

113.   The 2006 Alternatives Analysis admits that "the Fixed Guideway

Alternative would require more displacements and affect more potentially historic structures than the other alternatives." The "Fixed Guideway Alternative" identified in the 2006 Alternatives Report forms the basis of the current approved Project.

114. Because prudent and feasible alternatives to the Project exist, FTA violated Section 4(f) by executing the ROD.

115. The FEIS, the DEIS, public comments on the DEIS, the 2006 Alternatives Report, the 2006 Alternatives Screening Memo, and various other public documents (including public comments) also identify a number of means of mitigating the impacts of the Project on 4(f) Resources. Some of these means of mitigating the impacts of the Project on 4(f) Resources are not addressed in the ROD or otherwise incorporated into the Project.

116. Among other things, the FEIS does not evaluate the potential for the Project to impact 4(f) Resources by promoting new development and ground disturbance in the vicinity of rail stations. In an October 22, 2009 letter, the National Trust for Historic Preservation specifically proposed that Defendants undertake "planning to minimize harm" to those resources. No such planning is documented in the FEIS or the ROD, or otherwise incorporated into the Project.

117. Because the Project does not include all possible planning to minimize harm to 4(f) Resources, FTA's execution of the ROD violates Section 4(f).

118. For the reasons set forth above, Defendants' approval of the Project

violates Section 4(f).

## COUNT 8:  FAILURE TO ACCOUNT FOR EFFECTS ON HISTORIC PROPERTIES (NHPA)

119.   Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 118.

120.   Section 106 of the NHPA prohibits federal agencies from approving any undertaking unless the agency first takes into account the effects of the undertaking on historic properties.  16 U.S.C. § 470f.  This provision unequivocally requires federal agencies to complete the Section 106 review process "prior to the approval" of the federal undertaking.  *Id.*; *see also* 36 C.F.R. § 800.1(c).

121.   The Project is an undertaking and is therefore subject to Section 106 of the NHPA.

122.   In purported compliance with Section 106, Defendants approved a "Programmatic Agreement" assigning future responsibility for various historic preservation-related tasks.  The Programmatic Agreement admits that Defendants have not yet completed an archaeological inventory study of Native Hawaiian burial sites or an evaluation of TCPs for the entire Project route; rather, the Programmatic Agreement suggests that Defendants will complete those tasks sometime in the future (and after the execution of the ROD).  The Programmatic Agreement also fails adequately to address the possibility that additional development at or near rail stations will affect additional historic resources.

123.    For the reasons set forth above, Defendants have violated the

NHPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that (1) Defendants' FEIS, 4(f)

evaluation, and ROD are legally inadequate and (2) Defendants have violated

NEPA, Section 4(f), the NHPA, and the APA.

2.    Issue an injunction requiring Defendants to comply with the

following:

> (a) Immediately withdraw the ROD approving the Project; and
>
> (b) Prior to approving or re-approving the Project or any other
> proposed rail transit system, comply with the requirements of
> the NHPA and Section 4(f); and
>
> (c) Prior to approving or re-approving the Project or any other
> proposed rail transit system take one of the following two
> actions:
>
>> (i)    Prepare and circulate for public review and comment
>> a Draft EIS meeting the requirements of NEPA,
>> including, without limitation, the requirement that all
>> reasonable alternatives be considered, to be followed
>> by a Final EIS and a ROD; or

        (ii)     Prepare and circulate for public review and comment

a Draft Supplemental EIS meeting the requirements

of NEPA, including, without limitation, the

requirement that all reasonable alternatives be

considered, to be followed by a Final Supplemental

EIS and a Revised ROD

3.     Take no action with respect to the Project that could within the

meaning of 40 CFR § 1506(a): (1) have an adverse environmental impact, or (2)

limit the choice of reasonable alternatives until such time as the requirements of

2(c)(i) or (c)(ii), above, are satisfied.

4.     Award Plaintiffs their costs, including attorneys' fees, pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and NHPA, 16 U.S.C. §

470w-4.

5.     Grant such other and further relief as the Court deems just and

proper.

Dated: May 12, 2011

Respectfully submitted,

Michael J. Green (HI Bar No. 4451)
Attorneys for Plaintiffs
HonoluluTraffic.com, Cliff Slater,
Benjamin J. Cayetano, Walter Heen,
Hawaii's Thousand Friends, The Small
Business Hawaii Entrepreneurial
Education Foundation, Randall W. Roth,
and Dr. Michael Uechi.

Nicholas C. Yost (CA Bar No. 35297)
Matthew G. Adams (CA Bar No. 229021)
SNR Denton US LLP
525 Market Street, 26th Floor
San Francisco, CA  94105-2708
Telephone:  (415) 882-5000
Facsimile:  (415) 882-0300

Attorneys for Plaintiffs
HonoluluTraffic.com Cliff Slater,
Benjamin J. Cayetano, Walter Heen,
Hawaii's Thousand Friends, The Small
Business Hawaii Entrepreneurial
Education Foundation, Randall W. Roth,
and Dr. Michael Uechi.