1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| HONOLULUTRAFFIC.COM; CLIFF SLATER; BENJAMIN CAYETANO; WALTER HEEN; HAWAII'S THOUSAND FRIENDS; THE SMALL BUSINESS HAWAII ENTREPRENEURIAL EDUCATION FOUNDATION; RANDALL W. ROTH; and DR. MICHAEL UECHI, | Civ. No. 11-00307 AWT<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiffs,

vs.

FEDERAL TRANSIT ADMINISTRATION; LESLIE ROGERS, in his official capacity as Federal Transit Administration Regional Administrator; PETER M. ROGOFF, in his official capacity as Federal Transit Administration Administrator; UNITED STATES DEPARTMENT OF TRANSPORTATION; RAY LAHOOD, in his official capacity as Secretary of Transportation; THE CITY AND COUNTY OF HONOLULU; and WAYNE YOSHIOKA, in his official capacity as Director of the City and County of Honolulu Department of Transportation,

Defendants,

FAITH ACTION FOR COMMUNITY EQUITY; PACIFIC RESOURCE PARTNERSHIP; and MELVIN UESATO,

Intervenors - Defendants.

1   |_____|

2

3       HonoluluTraffic.com, et. al ("Plaintiffs"), claim that the City and County of

Honolulu (the "City") and the Federal Transit Administration ("FTA") (collectively,

"Defendants") have violated three federal statutes in the process of approving a twenty-

mile elevated guideway rail transit project (the "Project"):  (1) Section 4(f) of the

Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303; (2) the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; and (3) Section 106 of

the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f.  Now pending before

the court are the parties' cross-motions for summary judgment, which have been fully

briefed and argued.  For the reasons set forth below, Plaintiffs' motion is **granted in part**,

with respect to three claims arising under Section 4(f).  Defendants' motion is **granted in**

**part**, with respect to all other claims.

## I.    Background

      On December 27, 2005, the FTA published a Notice of Intent ("2005 NOI") to

prepare an Alternatives Analysis ("AA") and an Environmental Impact Statement ("EIS")

for a transit project in Honolulu.  AR 9700.  The stated purpose of the Project was to

provide improved mobility through the busy twenty-five-mile west-east transportation

corridor between Kapolei and the University of Hawaii at Manoa ("UH") and Waikiki.

*Id.*  The City undertook a scoping process and prepared an AA reviewing four

alternatives:  a no build alternative; improvements to the existing bus system ("the

transportation system management alternative"); an elevated express bus/carpool lane

alternative (the "managed lanes alternative"); and a railway alternative (the "fixed

guideway alternative").  AR 247 at 322.  The AA concluded that the fixed guideway

alternative was the only one that satisfied the Project's purpose and need.  *Id.* at 329.  The

Honolulu City Council subsequently selected the fixed guideway transit system as the

locally preferred alternative.  *Id.* at 296, 323.

- 2 -

1    The FTA then published a second Notice of Intent to prepare an EIS on March 15,

2    2007 ("2007 NOI").  AR 9696.  The 2007 NOI requested public comment on five

3    possible transit technologies:  light-rail; rapid-rail (steel wheel on steel rail); rubber-tire

4    guided; magnetic levitation; and monorail.  *See id.*  A five-member panel of experts

5    appointed by the City Council reviewed responses to that request, as well as twelve

6    responses from transit vehicle manufacturers and, in February 2008, on a vote of four-to-

7    one, selected steel-wheel-on-steel as the technology for the Project.  AR 247 at 331.

8    Honolulu voters subsequently approved a City Charter amendment to establish a steel-on-

9    steel rail system.  *Id.*

10    Defendants then prepared a Draft EIS ("DEIS") and a Final EIS ("FEIS").  *See* AR

11    247; 7223.  The DEIS and FEIS analyzed only four alternatives:  the no build alternative

12    and three elevated, fixed guideway, steel-on-steel railway routings.  AR 247 at 331-37.

13    All three fixed guideway options ran down the twenty-mile corridor between Kapolei and

14    Ala Moana Center, but via slightly different routes.  *Id.*  One fixed guideway option ran

15    via Salt Lake Boulevard, a second via the airport, and the third via both Salt Lake

16    Boulevard and the airport.  *Id.*  The FEIS selected the airport route as the preferred

17    alternative.  *Id.* at 337-38.  The FEIS also included an evaluation of the Project's potential

18    use of land from historic resources and public parks, pursuant to Section 4(f).  *Id.* at 680.

19    The FEIS concluded that the Project would use some historic resources in downtown

20    Honolulu, including the Chinatown Historic District, but found that there was no feasible

21    and prudent alternative to such use.  *Id.* at 718-27.

22    The FTA's Record of Decision ("ROD") approving the Project was issued on

23    January 18, 2011.  AR 30.  The FTA, the City, the Advisory Council on Historic

24    Preservation, the Hawaii State Historic Preservation Officer ("SHPO"), and the United

25    States Navy also entered into a Programmatic Agreement ("PA") pursuant to § 106 of the

26    NHPA, which was incorporated into the ROD.  AR 30 at 30-42, 83-228.  The Project is to

27    be funded using local tax revenues and federal funding from the New Starts program, *see*

28

- 3 -

49 U.S.C. § 5309, and is to be constructed in four phases. AR 247 at 362, 777.

On May 12, 2011, Plaintiffs filed this action, alleging that the FEIS and ROD approving the Project did not comply with the requirements of NEPA, Section 4(f), NHPA, and the regulations implementing those statutes. (Compl., Doc. 1).

## II.    The Legal Standard

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

"The Administrative Procedure Act ('APA') provides authority for the court's review of decisions under NEPA and Section 4(f) . . . ." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1152 (9th Cir. 2008). "Under the APA, the district court may only set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). A decision is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 1152-53 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). An agency has discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## III.   Merits

## A.    Section 4(f) Claims

Section 4(f) provides that the Secretary of Transportation (the "Secretary") may approve a transportation project requiring the "use" of a public park or historic site of

national, state, or local significance only if:  (1) "there is no prudent and feasible

alternative" to using the site; and (2) the project includes "all possible planning" to

minimize harm to the site resulting from the use.  49 U.S.C. § 303.  Section 4(f) therefore

imposes a substantive mandate on agencies implementing transportation improvements.

*N. Idaho Cmty. Action Network*, 545 F.3d at 1158.

> When a court reviews a Section 4(f) determination, it must ask three questions:

> First, the reviewing court must determine whether the Secretary acted within the scope of his authority and whether his decision was reasonably based on the facts contained in the administrative record. Second, the reviewing court must determine whether the Secretary's decision was arbitrary, capricious or an abuse of discretion because he failed to consider all relevant factors or made a clear error of judgment. Third, the reviewing court should decide whether the Secretary complied with the applicable procedural requirements.

*Ariz. Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1425 (9th Cir. 1983) (citing

*Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)); *see also Adler v.*

*Lewis*, 675 F.2d 1085, 1091 (9th Cir. 1982).

Plaintiffs' Section 4(f) claims fall into three categories.  First, Plaintiffs claim that

Defendants failed to identify Native Hawaiian burial sites and other traditional cultural

properties ("TCPs") prior to the issuance of the ROD.  Second, Plaintiffs assert that

Defendants erroneously concluded that the Project would not constructively use Aloha

Tower, Irwin Park, Walker Park, and Mother Waldron Park.[1]  Third, Plaintiffs claim that

Defendants failed to meet Section 4(f)'s substantive mandate, because Defendants

erroneously determined that there were no feasible and prudent alternatives to the Project

and because Defendants did not engage in all possible planning to minimize harm to

Section 4(f) sites.  Each of these claims is addressed in turn below.

**1.     Failure to Identify Native Hawaiian Burial Sites and Traditional**

---

[1]     Plaintiffs' claimed that the Project "used" a number of other sites protected under Section 4(f), other than those discussed in this Order.  Plaintiffs' attack on those other sites has been disposed of in an earlier summary judgment ruling.  *See HonoluluTraffic.com v. Fed. Transit Admin.*, 2012 WL 1805484 (D. Hawaii 2012).

**Cultural Properties**

a.     **Burial Sites**

The first step in a Section 4(f) analysis is the identification of possible Section 4(f) sites that could be "used" by the project.  Federal regulations provide that "[t]he potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study."  23 C.F.R. § 774.9(a).  Section 4(f) approval of a project must be made either in the FEIS or the ROD.  § 774.9(b).  Plaintiffs claim that Defendants have violated Section 4(f) by taking a "phased approach" to the identification of underground Native Hawaiian burial sites that could be disturbed along the route of the elevated guideway.  Native Hawaiian burial sites, including those discovered during construction, qualify as historic sites protected under Section 4(f), as long as they are included in, or eligible for inclusion in, the National Register of Historic Places.  *See* 23 C.F.R. §§ 774.11(f), 774.17.

Defendants admit that they have not yet carried out Archaeological Inventory Surveys ("AISs") to identify undiscovered burial sites across the entire twenty-mile length of the Project, even though Defendants concede that it is possible, and even likely in some areas, that the construction of the stations and columns of the elevated guideway may disturb such sites.  Defendants explain that they made the decision to wait because completion of an AIS requires excavation to a depth of five feet, AR 111849 at 111853, and the exact positioning of the Project's stations and columns had yet to be determined at the time the ROD was approved.  Consequently, to complete an AIS at that time, Defendants would have had to excavate far more areas, and could potentially have disturbed far more archaeological sites, than would be necessary once project plans were complete.  *See* 23 C.F.R. § 771.113(a)(1)(iii) (prohibiting final design activities on a transportation project until after the FEIS and ROD are complete).

Instead, Defendants produced an Archaeological Resources Technical Report in August 2008.  *See* AR 37676.  The Report used a number of resources, including soil

- 6 -

survey data, archaeological records, land survey maps, and field observations, in order to identify all known burial sites and to predict the likelihood of finding burials in each phase of the project. *See id.* at 37686, 37710-11.  The Report also suggested that there were many reasons not to carry out a full archaeological survey of the fixed guideway route prior to issuance of the ROD, including that the identification of resources beneath sidewalks, streets, and highways would significantly disrupt traffic, that the cost of the project would greatly increase if a full survey was undertaken, and that the survey would need to take place over a larger area than would actually be affected by the guideway because the footprint of the guideway was not yet known. *Id.* at 37704.  The Report concluded that a reasonable, good faith effort had been made to identify resources located within the Project alignments. *Id.*

In addition, prior to the issuance of the ROD, Defendants performed an AIS for Phase I of the Project; the document ran nearly five hundred pages.  AR 59459.  The FTA explains in its briefing that it was possible to complete the first AIS at an early stage because the western portion of the Project is less developed than downtown Honolulu and less likely to contain burial sites from traditional Hawaiian times. *See* Doc. 157 at 15.  In the PA, Defendants also provided for the protection and avoidance of later-discovered burials, specifying that subsurface testing will be conducted at each column location prior to construction and that efforts will be made to alter the construction plan to avoid newly-discovered burial sites with in-place significance. *See* AR 30 at 92-93; *see also* 23 C.F.R. § 774.9(f) ("Section 4(f) may apply to archaeological sites discovered during construction . . . . In such cases, the Section 4(f) process will be expedited and any required evaluation of feasible and prudent avoidance alternatives will take account of the level of investment already made.").

Plaintiffs argue that these efforts amount to just the sort of "phased approach" to

the identification of Section 4(f) sites that has been rejected in Ninth Circuit precedent.[2]

In *North Idaho Community Action Network*, the plaintiffs challenged a proposed highway project under Section 4(f). 545 F.3d at 1151. The Department of Transportation ("DOT") conceded that it had decided to take a phased approach to the identification of Section 4(f) and NHPA Section 106 historic sites, and so had not yet conducted any analysis of three of the four project phases, even though the ROD had already issued. *Id.* at 1158. The Ninth Circuit concluded that the DOT's action was in violation of Section 4(f), because the Section 4(f) evaluation must be completed prior to the issuance of the ROD. *Id.* at 1158-59.

Two D.C. Circuit cases have also discussed the timing of Section 4(f) evaluations. In *Corridor H Alts., Inc. v. Slater*, the Federal Highway Administration ("FHWA") approved a ROD for a highway, but made that approval conditional on the future identification of Section 4(f) properties in fourteen sections of the project. 166 F.3d 368, 371-72 (D.C. Cir. 1999). The court held that this action was in violation of Section 4(f) because the agency failed to make any preliminary Section 4(f) determinations prior to the issuance of the ROD. *Id.* at 373.

In contrast, in *City of Alexandria v. Slater*, the court upheld the FHWA's Section 4(f) analysis for plans to replace a bridge. 198 F.3d 862, 863-73 (D.C. Cir. 1999). The FHWA identified a number of historic sites along the project corridor and published a Section 4(f) evaluation prior to the approval of the ROD, but postponed the identification of Section 4(f) sites in areas where construction-related activities would occur, because the FHWA had yet to identify the locations that would be used for those activities. *Id.* at 865, 872. The court concluded that, given that the identification of the construction

---

[2]   In particular, Plaintiffs point to concerns voiced by the Oahu Island Burial Council ("OIBC"), National Trust for Historic Preservation, and a DOT official, all of whom suggested that it was important not to defer detailed identification of burial sites, especially in the downtown area, which is known to have a high concentration of undiscovered burials. *See* AR 125000 at 125005; 125208 at 125210; 124858 at 124858-59; 124645.

locations would require substantial engineering work that could not be conducted until after the ROD issued and that the sites postponed were merely "ancillary" to the project, Section 4(f) did not forbid the "rational planning process" adhered to by the FHWA. *Id.* at 873. It was not enough for the plaintiffs to argue that it would have been "feasible" to identify all Section 4(f) sites prior to the issuance of the ROD; "the standard of 'feasibility,' while relevant to whether an agency may use 4(f) properties, has no application in determining when the agency must identify them." *Id.*

This case differs from those prior cases. Unlike in *City of Alexandria*, the sites that Defendants have left unidentified until further engineering planning takes place are not "ancillary," but are those unidentified burial sites running directly down the fixed guideway route. On the other hand, in contrast to *North Idaho Community Action Network* and *Corridor H*, Defendants here have not deferred *all* Section 4(f) site identification to a later date; in fact, Defendants have made a significant effort to identify all known burials and predict the location of unknown burials.

The key question is whether Defendants have made a satisfactory effort to identify Section 4(f) sites. Plaintiffs contend that Defendants should have made *all* possible efforts to identify undiscovered burial sites down the main project corridor, while Defendants argue that only *reasonable* efforts were necessary, not full excavation of the guideway route.

Determining the necessary level of effort requires reference to NHPA § 106. All of the cases discussed above agreed that, because Section 4(f) historic sites are defined as properties on or eligible for listing on the National Register, the agency must first complete the Section 106 process for identification of historic properties in order to satisfy its Section 4(f) obligation to identify protected historic sites. *N. Idaho Cmty. Action Network*, 545 F.3d at 1159 ("[B]ecause the § 4(f) evaluation cannot occur until after the § 106 identification process has been completed, the § 106 process necessarily must be complete by the time the ROD is issued."); *City of Alexandria*, 198 F.3d at 871;

*Corridor H*, 166 F.3d at 370-71.

Federal regulations implementing § 106 provide that "the agency shall take the steps necessary to identify historic properties within the area of potential effects." 36 C.F.R. § 800.4(b). In describing the level of effort required to meet this mandate, the regulations provide:

> The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey. The agency official shall take into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects.

36 C.F.R. § 800.4(b)(1). Consequently, Because Section 4(f) compliance is predicated on identification of historic sites via the § 106 process, if an agency makes a "reasonable and good faith effort" to identify historic sites, the agency's Section 4(f) responsibility should also be satisfied.

Defendants have made a significant effort to pinpoint all known archaeological sites along the project route, and crafted a plan for dealing with any sites that may be later discovered as construction progresses. *See Valley Cmty. Pres. Comm. v. Mineta*, 373 F.3d 1078, 1089 (10th Cir. 2004) (holding that the FHWA had met its Section 4(f) obligations where a PA was adopted to deal with any impacts to previously unidentified cultural resources discovered during construction). Because Defendants have made this "reasonable and good faith effort" to identify § 106 sites, they have satisfied their obligation to identify Section 4(f) sites prior to the issuance of the ROD. Accordingly, Plaintiffs' Section 4(f) challenge to the identification of burial sites is rejected.

**b.      Traditional Cultural Properties**

Section 4(f) also protects properties of traditional religious and cultural importance to Native Hawaiian organizations if they are included in or eligible for inclusion in the National Register. 23 C.F.R. § 774.17. *National Register Bulletin 38* "provides the

- 10 -

1 recognized criteria for the . . . identification and assessment of places of cultural

2 significance." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 at 807 (9th

3 Cir. 1999). *Bulletin 38* defines a TCP as a property that is eligible for inclusion on the

4 National Register because of its association with cultural practices or beliefs of a living

5 community that are (a) rooted in the community's history, and (b) important in

6 maintaining the continuing cultural identity of the community. *Bulletin 38* at 1. Plaintiffs

7 claim that Defendants have failed to make sufficient effort to identify TCPs that could be

8 used by the Project. Because TCPs are not necessarily subterranean, Plaintiffs argue,

9 Defendants cannot assert that they did not identify TCPs because they are hidden

10 underground or difficult to identify.

11 Although Defendants prepared a Cultural Resources Technical Report, it did not

12 decide the § 106 or Section 4(f) eligibility of the cultural resources identified, but instead

13 jumped ahead to focus on possible adverse effects to those resources. *See* AR 38098. In

14 the FEIS, Defendants identified only one TCP, Chinatown, and stated that the City would

15 conduct a study to evaluate the project area for the presence of other TCPs. AR 247 at

16 623, 632, 718. If the FTA determined that any of later-identified TCPs were eligible for

17 inclusion on the National Register, then the City would meet with the § 106 consulting

18 parties to identify measures to avoid, minimize, and mitigate adverse effects to those

19 properties. *Id.* at 623. The PA also stated that preliminary cultural resources research had

20 identified one TCP, Chinatown, and that, within 30 days of the ROD, the City would

21 undertake a study to determine the presence of unidentified TCPs. AR 30 at 91. Neither

22 the FEIS nor the PA explained why Defendants did not undertake a comprehensive study

23 to identify TCPs at an earlier time.

24 There is no discussion in the record of the Section 4(f) eligibility of any identified

25 TCPs other than Chinatown, and the FEIS and PA suggest that only "preliminary" efforts

26 have been made to investigate whether meaningful cultural properties are situated within

27 the Project corridor. Because Defendants have presented no reason why it would have

28

been unreasonably difficult to identify such above-ground TCPs prior to issuance of the ROD, this decision to delay full study of above-ground TCPs was arbitrary and capricious.

Before continuing with the Project in any way that may use unidentified TCPs, Defendants must complete their identification of above-ground TCPs within the corridor. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1160-61 (construction need be delayed during completion of Section 4(f) evaluation only for those phases of the project for which such evaluation had not yet been completed). For any TCPs identified, Defendants must conduct a complete Section 4(f) analysis. The ROD must be supplemented to include any newly identified TCPs. The FEIS must also be supplemented to the extent that this process requires changes that "may result in significant environmental impacts 'in a manner not previously evaluated and considered.'" *Id*. at 1157 (quoting *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004)).

## 2.   Constructive Use Determinations

Plaintiffs also challenge Defendants' determination that the rail project would not constructively use four specific sites. A Section 4(f) site is "used" when land is permanently incorporated into a transportation facility, when there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose, or when there is a constructive use of land. 23 C.F.R. § 774.17; *see also Adler*, 675 F.2d at 1092 (noting that the term "use" is to be construed broadly to include areas that are significantly, adversely affected by a project but are not physically taken).

The regulations provide:

A constructive use occurs when . . . the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the property are substantially diminished.

23 C.F.R. §774.15(a); *see also Adler*, 675 F.2d at 1092 (observing that off-site activities are governed by Section 4(f) if they could create "sufficiently serious impacts that would

1   substantially impair the value of the site in terms of its prior significance and
2   enjoyment"). To make a constructive use determination, the agency must first identify
3   the current activities, features, or attributes of the property which qualify for protection
4   under Section 4(f), then must analyze the proximity impacts of the Project on the property
5   and, finally, must consult with officials with jurisdiction over the property. 23 C.F.R. §
6   774.15(d).
7           The regulations provide some examples of constructive use, including: (1) when
8   the projected noise level increase substantially interferes with the use and enjoyment of
9   an urban park where serenity and quiet are significant attributes, § 774.15(e)(1)(iv); (2)
10  when the proximity of the project obstructs or eliminates the primary views of an
11  architecturally significant historical building or substantially detracts from the setting of a
12  property which derives its value in substantial part due to its setting, § 774.15(e)(2); and
13  (3) when vibration impacts substantially impair the use of a property, § 774.15(e)(4).
14  Conversely, there is no constructive use where the impact of project noise levels does not
15  exceed the FTA noise impact criteria or where the increase in projected noise levels is
16  barely perceptible. § 774.15(f)(2)-(3).
17          The Ninth Circuit has addressed issues of proper constructive use determination in
18  a handful of cases. *See, e.g.*, *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d
19  517, 533 (9th Cir. 1994) (agreeing with the FHWA's conclusion that parks were not
20  constructively used where construction occurred over bike trails and the highway corridor
21  ran adjacent to a park); *Ariz. Past & Future Found.*, 722 F.2d at 1429-30 (determining
22  that there was no abuse of discretion when the agency determined that no historic sites
23  would be adversely affected by a project); *Adler*, 675 F.2d at 1093 (agreeing that the
24  agency did not err when it determined that fifty sites were not constructively used); *Stop
25  H-3 Ass'n v. Coleman*, 533 F.2d 434, 445 (9th Cir. 1976) (concluding, without detailed
26  explanation, that a petroglyph rock would be used by a highway that would pass near the
27  rock); *Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir. 1972) (determining that
28

- 13 -

1    encirclement of a campground by a freeway is a constructive use).[3]

2    These principles and precedents inform the analysis of the four sites that remain at

3    issue here, Aloha Tower, Walker Park, Irwin Park, and Mother Waldron Park.

4    **a.    Aloha Tower**

5    Plaintiffs contend that Defendants erred in determining that the Project would not

6    constructively use Aloha Tower because the Project will alter views of the tower from

7    inland.  The National Register of Historic Places nomination form for Aloha Tower

8    explains that the tower is a modernist interpretation of a Gothic tower and that it

9    traditionally served as a symbol of warm welcome for visitors who arrived by sea and

10   who could see the white tower from fifteen miles away.  AR 152826 at 152827-28.  The

11   tower remains a symbol of Hawaii's investment in tourism at a time when sea travel was

12   the island's main link with the rest of the world.  *Id.* at 152828.  The tower was also a

13   center of planning for military operations in World War II.  *Id.*

14   The Project will sit 420 feet inland of the tower, in the median of the six-lane

15   Nimitz Highway.  AR 247 at 746.  Defendants' Historic Effects Report, published in

16   April 2009, concluded that views from the ocean to the tower and views from the tower's

17   observation deck to the ocean and island are a historic visual feature of Aloha Tower and

18   would not be impaired by the project.  AR 39555 at 39872.  The Report also noted that

19   Aloha Tower is often not visible from points inland, because of vegetation and the many

20   high-rise buildings in downtown Honolulu.  *Id.* at 39872-73.  Consequently, even if views

21

22   [3]     Cases from other circuits provide further guidance. *See, e.g.*, *Coal. Against a
     Raised Expressway (CARE) v. Dole*, 835 F.2d 803, 811 (11th Cir. 1988) (determining that

23   there was a constructive use of historic buildings and a park that were immediately adjacent
     to a highway based on the cum ulative effects of air po llution, noise im pacts, and view

24   impacts); *Citizen Advocates for Responsible Expansion, Inc. (I-CARE) v. Dole*, 770 F.2d 423,
     441-42 (5th Cir. 1985) (concluding that a Section 4(f) report was deficient where it gave no

25   consideration to the effects th at a highway would have on a garden nine feet away and

26   because it would border on the ridiculous to suggest that a highway would have m inimal
     effects on a historic building with exterior f eatures that would be greatly impacted by the

27   highway).

28                                           - 14 -

of the tower from inland were obstructed by the project, no historically significant visual features would be altered. *Id.*

In its Section 4(f) analysis, the FEIS noted that Aloha Tower qualifies for protection as a historic property because of its Art Deco design elements and its historic associations with the harbor. AR 247 at 745-46. The FEIS concluded that Aloha Tower will still be visible from many vantage points inland and that, while some views of the tower from inland would be altered, the project would not block any views. *Id.* at 746. Consequently, the Project would not substantially impair views of the tower's design elements nor alter its historic setting; therefore, Aloha Tower would not be constructively used. *Id.*; *see also* AR 30 at 183 (ROD concluded that there was no direct impact on the tower). However, the FEIS also indicated that the guideway structure would partially block a view of the Aloha Tower from the Fort Street Mall. AR 247 at 512; *see also id.* at 540 (noting that the guideway and columns will block portions of views towards the water along a number of downtown streets), 528 (visual simulation of the change to the view from Fort Street Mall).

Plaintiffs point to the AA, which stated that, if the railway project was routed along Nimitz Highway, there would be "severe visual impacts" for Aloha Tower. *See* AR 9556 at 9623. This evidence, however, is not enough to show that Defendants' Section 4(f) use determination as to Aloha Tower was arbitrary and capricious. The ROD shows that Defendants thoroughly considered the impacts to views from and of Aloha Tower and reasonably concluded that the historically significant views of the tower were those from the sea. Accordingly, Plaintiffs' claim that Defendants' no-use determination for Aloha Tower was erroneous is rejected.

**b.     Walker Park**

Plaintiffs claim that Defendants' determination that the Project would not use Walker Park was erroneous because the Project would impair Walker Park's historic associations and because Defendants failed to analyze noise and visual impacts on the

park.  Walker Park is a small triangular urban park in downtown Honolulu, about 150 feet inland of Nimitz Highway.  AR 247 at 731; *see also* AR 62527 at 62527-37, 62682 at 62682-85 (photographs of the park and surrounding area).  It is surrounded by high-rise buildings and the at-grade Nimitz Highway.  AR 247 at 731.  The park provides shade in the busy downtown area and is primarily used by pedestrians walking through the area. *Id.*  It contains a fountain and a seating area, and is bordered by mature palm trees.  *Id.*; *see also id.* at 690 (noting that Walker Park provides shade, but has no benches, picnic tables, or other amenities).  The park is eligible for the National Register for its associations with the development of the waterfront and central business district and as an early example of created greenspace in that area.  *Id.* at 744.  Accordingly, Walker Park is eligible for Section 4(f) protection both as a public park and a historic site.

A number of supporting documents in the record discuss Walker Park.  The Historic Effects Report noted that the inland edge of the rail project guideway would be about twenty feet from the seaward edge of the park boundary.  AR 39555 at 39861.  The Report concluded, however, that there would be no adverse effect on Walker Park's historic features because the Project would not affect the property's integrity of location nor alter its design elements.  *Id.*  The Report also stated that no historically significant viewsheds to or from the property were identified, that no audible or atmospheric effects to the property were identified, and that the project would not diminish Walker Parker's expression of its historic character.  *Id.* at 39862.

A number of Noise and Vibration Technical Reports were prepared for the project. *See* AR 33642, 42163, 72897.  To create these reports, the FTA conducted noise measurements at representative locations along the project corridor to establish existing environmental noise conditions.  AR 33642 at 33651.  An October 2009 Report established that a location near Walker Park experienced 67 decibels of existing noise, and that the project noise exposure would be 65 decibels, below the FTA threshold for unacceptable noise impacts.  AR 72897 at 72926.

1   The FEIS concluded that there would be no adverse noise and vibration impacts to

2   Walker Park. AR 247 at 729. In addition, Walker Park would not be constructively used

3   because the Project would not change views from within the park of the business district

4   it serves and would not substantially impair the park's historic associations. *Id.* at 731,

5   744; *see also* AR 30 at 181-82 (stating that the project will nominally affect seaward

6   views from the park, but not views of the business district it serves); *but see id.* at 540-41

7   (noting that trains traveling on the guideway will create light and glare and that overall

8   visual effects in the area of the Dillingham Transportation Building will be significant).

9   Defendants considered impacts to Walker Park both as a park and as a historic site,

10   and Plaintiffs have not specified any historically significant views that will be impacted

11   by the railway. Plaintiffs complain that Defendants did not examine historic documents

12   describing the park, but because they nevertheless considered the historic integrity of the

13   park, they were not required to do so. Moreover, the FEIS analyzed the impact to the

14   park's visual qualities and found that the surrounding trees would protect the park.

15   Plaintiffs also complain about the sound impact analysis in the FEIS, but Plaintiffs

16   mistakenly rely on raw, unanalyzed sound data in the record, *see* AR 22575 at 22649-50.

17   In any case, Walker Park is mainly used as a pedestrian thoroughfare and there is no

18   evidence that quiet and serenity are significant features of the park necessitating special

19   protection. Defendants' determination that Walker Park would not be used was neither

20   arbitrary nor capricious.

21   **c.    Irwin Park**

22   Plaintiffs challenge Defendants' no-use determination as to Irwin Park, claiming

23   that Defendants never analyzed noise impacts on Irwin Park and that Defendants did not

24   analyze the project's impact on protected landscape features of the park. Irwin Park

25   consists primarily of parking lots with grass medians and is adjacent to Aloha Tower and

26   Piers 10/11. AR 39555 at 39865; *see also id.* at 39869-70 (visual simulation of effects).

27   The inland setting of the park contains Nimitz Highway and non-historic high-rise

28

- 17 -

1   development. *Id.* at 39866.  The park mostly serves as a parking lot for surrounding

2   office buildings, but has high-quality scenic seaward views and provides seating areas

3   heavily used at lunchtime by workers.  AR 247 at 690, 731.  The park is eligible for

4   listing on the National Register because of its associations with the beautification of the

5   waterfront and with William G. Irwin, and because it represents the work of leading

6   landscape architect, Robert O. Thompson.  *Id.* at 746.  The Project will be located in the

7   median of the highway, seventy feet inland of the park and 200 hundred feet inland of the

8   main seating area.  *Id.* at 732.

9        The Historic Effects Report found that the Project would not alter design elements

10  or features of the park, would have no effect on the property's integrity of design or

11  setting, and would not alter any historically significant views.  AR 39555 at 39866.

12  Additionally, there were no audible or atmospheric effects identified.  *Id.*  The Noise and

13  Vibration Report measured sound at the nearby Aloha Tower Marketplace, one of the

14  locations considered representative of "all noise-sensitive land uses along the corridor,"

15  and found that the Project would have no serious sound impacts on the area.  AR 33642 at

16  33695, 33673; *see also* AR 72897 at 72919 (predicting noise impacts for sites near Irwin

17  Park).

18       The FEIS concluded that there would be no constructive use of the park,

19  considered both as a public park and a historic site.  AR 247 at 732.  There would be no

20  noise impact at the nearby Aloha Marketplace above existing levels.[4]  *Id.* at 561.  The

21  project would not cause noise and vibration impacts and would only partially obstruct

22  views towards non-historic office buildings.  *Id.* at 732.  Views of the water from the park

23  and views of the park from the harbor or Aloha Tower would not be obstructed and the

24  _____

25       [4]    Plaintiffs complain that the FEIS' noise impact conclusions were derived from
    measurements taken away from Irwin Park at a busy marketplace.  However, Irwin Park is
26  an  urban park adjacent to a heavily-used highway, and it was not unreasonable for
    Defendants' experts to rely on sound measurements taken at a representative location only
27  a block away from Irwin Park.

28

historic attributes of the park would not be impaired. *Id.* at 746-47. Defendants also thoroughly considered the park's historic attributes, including its landscaping and the "feeling" of the park. Their decision, thus, was not a violation of Section 4(f).

### d. Mother Waldron Park

Finally, Plaintiffs argue that Defendants' no-use determination for Mother Waldron Park is erroneous, because there was no analysis of the noise impacts on the park and because the project will have negative impacts on the park's historic and artistic features. Mother Waldron Park contains a playground with Art Deco architectural and landscape design elements and is eligible for listing in the National Register because of its association with the nationwide playground movement and as an excellent example of Art Deco design by a well-known architect. AR 39555 at 39909; *see also* AR 153157 at 153169 (National Register nomination form for Mother Waldron Park, noting that it is a flat, open, landscaped area containing one of only two playgrounds in Honolulu that retains its historic integrity); AR 62630-35 (photographs of the park). The park is set in a mixed-use commercial and industrial area and is surrounded by vacant lots, warehouses, commercial buildings, and an apartment building. AR 247 at 732. The guideway will be twenty feet away from the park boundary, about seventy feet from the playground and 290 feet from the volleyball court. *Id.* The guideway will be thirty-five to forty feet high. *Id.* at 747.

Unlike the other Section 4(f) sites discussed above, there is a great deal of evidence in the record that the project's impacts on Mother Waldron Park will be quite serious. The Historic Effects Report observed that the Project would have an adverse effect on the historic playground, because the playground is primarily an outdoor recreation facility and so the Project would adversely affect the integrity of the park's setting. AR 39555 at 39909. The guideway would introduce a new element into the setting in close proximity and would therefore affect the park's feeling and historic character; the park has high integrity of feeling, conveying its origins as a New Deal-era

- 19 -

park, and the guideway is out of character with the historic appeal of the playground. *Id.* at 39910.  The Visual and Aesthetic Resources Technical Report includes a visual simulation of the project's effects on the park and concludes that the overall visual effect would be high.  AR 33496 at 33599-602.  The FTA also commented on the FEIS, noting that there would be "devastating" impacts on seaward views of and over the park from the apartment buildings inland of the guideway.  AR 72988 at 72998.

The FEIS and ROD glossed over these troubling observations.  The FEIS concluded that Mother Waldron Park would not be constructively used because there would not be a substantial impairment of any visual or aesthetic features that contribute to the park's use and enjoyment.  AR 247 at 732.  In addition, the FEIS concluded that, while the visual impacts of the project on the park would be significant and would contrast significantly with the scale and character of the park, *id.* at 512, primary views of the playground would not be eliminated and the project would not substantially impair the park's design elements.  *Id.* at 747.  Finally, the FEIS provided noise measurements taken at Mother Waldron Park indicating that the noise exposure would be below the FTA's impact criteria.  *Id.* at 561; *see also* AR 72897 at 72920.  The PA likewise concluded that there would be no impact to the park from the Project and that it would not affect design elements or aesthetic features that contribute to the park's use and enjoyment, although there would be an effect to the setting.  AR 30 at 185.

Because the FEIS and PA did not adequately address why alterations to Mother Waldron Park's historic setting did not amount to constructive use, the no-use determination was arbitrary and capricious.  *Cf. I-CARE*, 770 F.2d at 441-42.  Before continuing with any part of the Project that may constructively use Mother Waldron Park, Defendants must reconsider their no-use determination, taking full account of evidence that the Project will significantly affect the park.  If Defendants conclude that the Project will, in fact, constructively use Mother Waldron Park, they must seek prudent and feasible alternatives to such use, or otherwise mitigate any adverse impact from

- 20 -

1  constructive use of the park.  49 U.S.C. § 303(c).  The ROD must be supplemented

2  accordingly.  The FEIS must also be supplemented, to the extent that this process affects

3  its analysis or conclusions.  *N. Idaho Cmty. Action Network*, 545 F.3d at 1157.

4  **3.     Section 4(f) Alternatives Analysis and Planning**

5      **a.     Feasible and Prudent Alternatives**

6      The FTA may only approve a project using a public park or historic site if there is

7  no prudent and feasible alternative to using that land.  49 U.S.C. § 303(c).  Accordingly, a

8  Section 4(f) evaluation must include sufficient supporting documentation to demonstrate

9  why there is no feasible and prudent avoidance alternative.  23 C.F.R. § 774.7.  A feasible

10  and prudent alternative "avoids using Section 4(f) property and does not cause other

11  severe problems of a magnitude that substantially outweighs the importance of protecting

12  the Section 4(f) property."  23 C.F.R. § 774.17.  An alternative is not feasible if it cannot

13  be built as a matter of sound engineering judgment.  *Id.*  An alternative is not prudent if,

14  among other things, it "compromises the project to a degree that it is unreasonable to

15  proceed with the project in light of its stated purpose and need" or it "results in additional

16  construction, maintenance, or operational costs of an extraordinary magnitude."  *Id.*

17      **I.     Managed Lanes Alternative ("MLA")**

18      Plaintiffs claim that the MLA was a feasible and prudent alternative to the use of

19  Section 4(f) sites in downtown Honolulu, including Chinatown and the Dillingham

20  Transportation Building, and that Defendants erroneously failed to consider it as such.

21  Defendants respond that the MLA was imprudent because it did not satisfy the purpose

22  and need of the Project.

23      Ninth Circuit case law is clear that alternatives that do not accomplish the stated

24  purpose of a project may be rejected as imprudent.  *See Alaska Ctr. for the Env't v.*

25  *Armbrister*, 131 F.3d 1285, 1288-89 (9th Cir. 1997) (holding that if an alternative does

26  not meet the purpose of a project, then the agency does not need to show that "unique

27  problems" or "truly unusual factors" make the alternative imprudent under Section 4(f));

28

*Ariz. Past & Future Found.*, 722 F.2d at 1428; *see also City of Alexandria*, 198 F.3d at 873 (noting that the D.C. Circuit has squarely held that an alternative cannot be prudent if it does not satisfy the transportation needs of the project).  The guidance laid out in the FHWA Section 4(f) Policy Paper further supports this conclusion.  *See* AR 21938 at 21945 (explaining that any alternative that is determined not to meet the need of the project is not feasible and prudent).

The stated purpose of the FEIS was to provide high-capacity rapid transit in the highly congested east-west transportation corridor between Kapolei and UH Manoa; to provide faster, more reliable public transportation service than could be achieved by buses in mixed-flow traffic; to provide reliable mobility in areas where people of limited income and an aging population live; to serve rapidly developing areas of the study corridor; and to provide an alternative to private automobile travel.  AR 247 at 312.  Assuming that this purpose was not overly narrow, a possibility discussed in further detail in Part III.B, *infra*, then the MLA was legitimately rejected as imprudent as long Defendants did not arbitrarily and capriciously conclude that the MLA failed to meet the purpose of the Project.

The FEIS explained that the MLA was considered during the AA but was rejected because it would not meet the Project's purpose and need; specifically, the MLA would not moderate congestion, would be less effective at providing faster and more reliable transportation service and alternatives to private automobile travel, and would not support transportation equity.  AR 247 at 321-27.  The ROD confirmed that the MLA was eliminated because it failed to meet the Project's purpose, because it would not have improved mobility or reliability in the corridor.  AR 30 at 36.  These conclusions were based on the AA, which found after detailed study of two versions of the MLA that it would result in an increase in vehicle hours of delay and would not encourage smart growth.  AR 9434 at 9541-42.  Moreover, buses using the MLA would continue to be affected by congestion at entry and exit points from the elevated lanes.  *Id.* at 9544.

Plaintiffs cite a response letter from HonoluluTraffic.com, dated November 4, 2009, subsequent to the close of the FEIS comment period, as evidence that the MLA would serve the purpose of the project, because it would greatly expand transit ridership and reduce traffic congestion.  AR 71958 at 71960.[5]  The letter cited a micro-simulation study showing that the MLA would reduce drive times even for people who never used the lanes.  *Id.* at 71959.  This evidence is not enough to demonstrate that Defendants' determination to the contrary was arbitrary and capricious.  The record indicates that Defendants reasonably relied on the opinions of their own experts and decided that the MLA would not meet the purpose and need of the Project, therefore making it an imprudent alternative.

Still, Plaintiffs argue that this determination was not sufficient to satisfy Section 4(f), because Defendants did not *explicitly* state in the FEIS or the ROD that the MLA was imprudent because it did not meet the purpose of the Project.  Plaintiffs point to no statute, regulation, or case requiring that Section 4(f) findings be made explicit in the record, however.  "Magic words" are not required in a Section 4(f) analysis and courts may not "fly speck" a determination if it appears that all factors and standards were considered.  *Adler*, 675 F.2d at 1095; *see also Hickory Neighborhood Def. League v. Skinner*, 910 F.2d 159, 163 (4th Cir. 1990) ("Although the Secretary's section 4(f) evaluation does not expressly indicate a finding of unique problems, the record amply supports the conclusion that the Secretary did determine that there were compelling reasons for rejecting the proposed alternatives as not prudent."); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (observing that formal findings are not required in a Section 4(f) determination and that the entire record must be reviewed to ensure that there was consideration of the relevant factors and no clear error of judgment).

Review of the entire record reveals that there is ample evidence to support

---

[5]     Plaintiffs' argument that the MLA met the purpose and need of the Project is discussed in further detail in Part III.B, *infra*.

Defendants' determination that the MLA was not a feasible and prudent alternative for

Section 4(f) purposes because it did not serve the project's purpose and need.  The FEIS

specifically noted in its Section 4(f) analysis that alternatives that would not meet the

Project's purpose and need would not be prudent under § 774.17, and referenced the

AA's determination that only the fixed guideway met the Project's purpose and need.  AR

247 at 684.  This analysis makes clear that Defendants recognized that the MLA had been

found not to meet the purpose of the project in the AA; consequently, Defendants did not

need to analyze the MLA's feasibility and prudence in the Section 4(f) analysis, because

was already imprudent by implication.  Accordingly, Plaintiffs' argument that Defendants

failed to consider the prudence of the MLA alternative is rejected.

### ii.      Tunnel Alternatives

Plaintiffs also argue that Defendants did not consider two feasible and prudent

alternate routes for the railway system, the King Street Tunnel alignment and the

Beretania Street Tunnel alignment.  Both would run underground and avoid using some

above-ground Section 4(f) properties, including Chinatown and the Dillingham

Transportation Building.  The FEIS concluded that the tunnels were not prudent, because

they would have increased the cost of the project by $650 million in 2006 dollars, which

would be beyond the funding in the project plan.  AR 247 at 705, 719-20; *see Citizens for

Smart Growth v. Sec'y of the Dep't of Transp.*, 669 F.3d 1203, 1217 (11th Cir. 2012)

(holding that extraordinarily high costs are sufficient foundation for finding an alternative

imprudent).  The rail project alternative actually adopted in the FEIS was estimated to

cost $4.3 billion in 2009 dollars. *Id.* at 756-59.

Plaintiffs first argue that the $650 million estimate is not supported by the record,

and that even a $650 million increase in project costs is not an "extraordinary" increase in

cost such that the tunnel alternatives are rendered imprudent.  Second, they claim that

only the King Street Tunnel will cost $650 million, while the Beretania Street Tunnel

would be cheaper, and that the FEIS therefore failed to adequately consider the Beretania

1  Street route.

2      As to Plaintiffs' first claim, there is good support in the record for the $650 million

3  figure for the King Street Tunnel alternative. *See* AR 9434 at 9523, 9540 (noting that the

4  King Street Tunnel alignment is the most expensive of the tunnel alignments); 67416

5  (Final Capital Costing Memorandum, 2006).  Plaintiffs point to a 2007 cost estimate

6  indicating that the King Street Tunnel would be significantly less expensive, AR 65304,

7  but that report specifically noted that its estimates only covered construction costs and did

8  not include utility relocation costs, underground station costs, track work, or other

9  maintenance costs. *See id.* at 65334.  Accordingly, it was not arbitrary and capricious for

10  Defendants to conclude that the King Street Tunnel would cost $650 million in 2006

11  dollars.

12      Plaintiffs point out that a $650 million cost increase amounts to less than twenty

13  percent of the total cost of the project without any tunnel.  There is little guidance in prior

14  case law discussing when a cost increase becomes excessive enough to make an

15  alternative imprudent. *See Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 703

16  (3d Cir. 1999) (holding that costs were of a sufficiently extraordinary magnitude when

17  building an alternative would cost many times the amount that the construction of the

18  preferred alternative would cost).  However, whether viewed as a dollar amount or as a

19  percentage of the Project's total cost, giving at least some deference to the agency's

20  financial judgment, the Court cannot conclude that it was arbitrary and capricious for

21  Defendants to conclude that an additional $650 million would be an extraordinary added

22  cost.  Accordingly, Plaintiffs' claim that Defendants' determination that the King Street

23  Tunnel alternative was imprudent for cost reasons is rejected.

24      The record is less clear, however, as to the exact cost estimate for the Beretania

25  Street Tunnel, and Defendants admit that it might have been less costly than the King

26  Street route. *See* AR 9434 at 9523, 9540; Doc. 157 at 29 n.13.  The FEIS nevertheless

27  rejected *both* the King Street and Beretania Street alternatives as imprudent based on the

28

1   $650 million cost estimate.  *See* AR 247 at 705, 719-20.

2          Defendants now offer a number of reasons why the Beretania Street Tunnel did not

3   meet the purpose and need of the Project, which they argue rendered it imprudent, even if

4   the FEIS nowhere explicitly so found.  Defendants suggest that the Beretania Tunnel

5   would have posed risks to below-ground cultural resources, might have encountered

6   groundwater during construction, and would have disturbed large areas on the surface

7   downtown.  *See* AR 65304 at 65321 (Tunnels and Underground Stations Technical

8   Memorandum, generically describing possible problems with groundwater and the

9   likelihood that hard rock tunneling would be necessary along the Beretania route), 65321

10  (noting the risk of shallow groundwater and ground and structure settlement during tunnel

11  construction), 65328-29 (describing safety, noise, traffic, dust, and other concerns as a

12  result of excavation and construction of tunnels).  But other portions of the record

13  indicate that the Beretania Street route could have been excavated using a tunnel boring

14  machine, which would not disturb the surface and would dig at a level below most burial

15  sites.  AR 50082 at 50157 (Environmental Consequences Draft); *cf.* AR 51561 at 51595

16  (specifically noting that the *King Street alignment* could cause structural damage on

17  adjacent sensitive buildings and could encounter groundwater issues).

18          As further justification for their decision, Defendants argue that the Beretania

19  alignment would not serve the Project's purpose because it would not go to Ala Moana

20  Center and would consequently serve fewer passengers.  There is some indication in the

21  record that this was a concern about the Beretania route.  *See* AR 9434 at 9520 (noting

22  that the Beretania Street Tunnel route would serve the fewest residents and jobs), 9540

23  (observing that the Beretania Street Tunnel route would provide poor transit benefits).

24          In other words, while Defendants have pointed to some justifications that could

25  have provided support for a decision to reject the Beretania Tunnel alternative as

26  imprudent, none of these concerns was articulated in the FEIS.  In fact, at no point in the

27  record did Defendants explicitly conclude that the Beretania alignment was either

28

inconsistent with the purpose and need of the Project or imprudent for any reason not related to cost concerns. While Section 4(f) review is based on a review of the entire record, *see Overton Park*, 401 U.S. at 420, Defendants' explanations appear to be *post hoc* rationalizations for their decision to reject the Beretania route. Defendants' failure to include full analysis of whether the Beretania option was a prudent and feasible alternative during the DEIS, FEIS, and ROD process was arbitrary and capricious.

Defendants must fully consider the prudence and feasibility of the Beretania tunnel alternative specifically, and supplement the FEIS and ROD to reflect this reasoned analysis in light of evidence regarding costs, consistency with the Project's purpose, and other pertinent factors. *See Citizens for Smart Growth*, 669 F.3d at 1217. Should Defendants determine, upon further examination of the evidence, that their previous decision to exclude the Beretania alternative because it would be imprudent was incorrect, they must withdraw the FEIS and ROD and reconsider the project in light of the feasability of the Beretania tunnel alternative. *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

### iii.    Alternative Technologies

Plaintiffs claim that Defendants should have considered two alternative technologies, bus rapid transit and at-grade light-rail, as feasible and prudent alternatives that would avoid Section 4(f) sites. The FEIS and ROD rejected both of these technologies as not meeting the purpose and need of the Project and so, if that determination was proper, then both alternatives were properly found imprudent for the same reasons explained with respect to the MLA above. AR 247 at 324 (FEIS concludes that bus rapid transit would not meet purpose and need of the Project because buses would still operate in mixed traffic, congestion would not be alleviated, and it would not have encouraged growth in the project corridor); AR 30 at 35 (ROD explains that at-grade light-rail would not have met Project's purpose and need because it would not have

satisfied the mobility and reliability needs of the Project, as capacity would be too low, traffic lanes would need to be removed, and congestion would have been exacerbated).

There is ample support in the record for these determinations. Defendants consistently maintained in the FEIS and the ROD, as well as in their responses to comments, that the bus system would not alleviate congestion because of the problems with a mixed traffic system, and that at-grade rail would not satisfy the Project's objectives because it would have to consist of smaller railcars that would stop cross-traffic as they passed and be forced to halt if traffic accidents occurred. *See* AR 247 at 321-324; AR 30 at 35; AR 855 at 974-75. Accordingly, Defendants' decision not to consider these alternatives further was neither arbitrary nor capricious.

### b.    All Possible Planning

In order to approve a project that uses Section 4(f) sites, an agency must also include all possible planning to minimize harm to section 4(f) property. 23 C.F.R. § 774.3(c)(2). "All possible planning means that all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects must be included in the project." 23 C.F.R. § 774.17. The "all possible planning" clause requires that the federal agency make reasonable efforts to minimize harm to Section 4(f) sites by balancing the harm to the site by the proposed project with the harm to the same site by another alternative or a plan to implement mechanisms that would diminish that particular harm. *Adler*, 675 F.2d at 1094.

Plaintiffs argue that Defendants failed to include all possible planning in their Section 4(f) evaluation because they did not evaluate the use of Chinatown, as a TCP, by the Project passing through the district, and because Defendants failed to take into account that the railway would block views of the harbor from Chinatown. Defendants argue in response that they satisfied their planning obligations as to Chinatown, a historic site, when they entered into the PA pursuant to NHPA § 106.

In support of their contention that entering into a PA is all that is required to satisfy

- 28 -

1   their obligation to include "all possible planning" to minimize harm to Section 4(f) sites,

2   Defendants point to the language of § 774.17:

3           With regard to historic sites, the measures normally serve to protect the
            historic activities, features, or attributes of the site as agreed by the
4           Administration and the official(s) with jurisdiction over the Section 4(f)
            resource in accordance with the consultation process under 36 C.F.R. part
5           800.

6   23 C.F.R. § 774.17.  The plain meaning of this regulation indicates that engaging in "all

7   possible planning" will *normally* serve to preserve the protected attributes of historic

8   properties; it does not state that satisfying NHPA by entering into a PA will always and

9   automatically satisfy Section 4(f) planning requirements.  *See* AR 21948-49 (policy paper

10  noting that mitigation of historic sites *usually* consists of those measures agreed to in

11  accordance with the NHPA).  In other words, it is conceivable that further reasonable

12  mitigation possibilities could exist beyond those explored in a PA, and those must be

13  considered to satisfy Section 4(f).  In this case, the FEIS notes that the guideway was

14  designed to be as narrow as possible in order to avoid negative impacts to Chinatown, and

15  that community input will be sought on the Chinatown station design.  The PA includes

16  further measures to deal with cultural properties discovered during construction.  AR 247

17  at 718-20; AR 30 at 61, 105-06.  Plaintiffs have not suggested any reasonable mitigation

18  measures that Defendants could have undertaken, but did not, in order to further mitigate

19  impacts on Chinatown.  Defendants have satisfied the "all possible planning"

20  requirement, given these mitigating features described in the FEIS and PA.

21  **B.      NEPA Claims (Counts 1-4)**

22  **1.      Purpose and Need**

23          Plaintiffs claim that the statement of purpose and need in the FEIS was too narrow,

24  thereby dictating that an elevated fixed guideway railway would be the only alternative

25  that could meet the Project's stated purpose.  An EIS is required briefly to specify the

26  underlying purpose and need to which the agency is responding in proposing the

27  alternatives in the EIS.  40 C.F.R. § 1502.13.  The purpose and need statement in the

28

FEIS here was quite lengthy and specific.  The following purposes were specified:  (1) to provide high-capacity rapid transit in the highly congested corridor between Kapolei and UH Manoa; (2) to provide faster, more reliable public transportation than could be achieved by buses operating in congested mixed-flow traffic; (3) to provide reliable mobility in areas where people of limited income and an aging population live; (4) to serve rapidly developing areas; and (5) to provide additional transit capacity and an alternative to private automobile travel and to improve transit links.  AR 247 at 312; *see also* AR 9696 at 9697-98 (stating similar goals in the 2007 NOI).  Ultimately, only a fixed guideway rail system was determined to meet this purpose and need, and, as a result, the FEIS analyzed three fixed guideway rail systems using the same technology but traveling slightly different routes, as well as a no-build alternative.  AR 247 at 319-37.

Defendants assert that this statement of purpose and need was developed throughout the AA process to respond to local needs and federal statutory goals.[6] Agencies enjoy "considerable discretion" in defining the purpose and need of a project, but they cannot define the project's objectives in "unreasonably narrow terms," such that only one alternative would accomplish the goals of the project and the EIS becomes a foreordained formality.  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010); *see also Davis v. Mineta*, 302 F.3d 1104, 1118-20 (10th Cir. 2002).  On the other hand, an agency may not frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals. *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).  A district court evaluates an agency's statement of purpose for reasonableness.  *Nat'l Parks &*

---

[6]     Federal regulations provide that an agency may use federally-supervised state-developed planning studies in order to produce a purpose and need statement.  23 C.F.R. § 450.318(a); *see also* 23 C.F.R. Pt. 450 App'x A at 11 ("With proper documentation and public involvement, a purpose and need derived from the planning process can legitimately narrow the alternatives analyzed in the NEPA process.").  This is the process that Defendants followed.

1   *Conservation Ass'n*, 606 F.3d at 1070.

2      In assessing the reasonableness of a purpose and need statement in an EIS, the

3   court must consider the statutory context of the federal action at issue. *League of*

4   *Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012); *see also*

5   *Citizens Against Burlington*, 938 F.2d at 196 (stating that "an agency should always

6   consider the views of Congress, expressed, to the extent that the agency can determine

7   them, in the agency's statutory authorization to act, as well as in other congressional

8   directives"); *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983)

9   ("Frequently, a pertinent guide for identifying an appropriate definition of an agency's

10  objective will be the legislative grant of power underlying the proposed action.").

11     In this case, the statement of purpose and need, while highly detailed, was broad

12  enough to allow the agency to assess various routing options and technologies for the

13  fixed guideway.  In addition, the stated purposes clearly and faithfully reflect the

14  objectives of the statutes under which the FEIS arose.  Specifically, 23 U.S.C. § 139(f)(3),

15  one of the provisions of the Safe Accountable Flexible Efficient Transportation Equity

16  Act:  A Legacy for Users ("SAFETEA-LU"), provides that a federally-funded

17  transportation project's purposes may include achieving a transportation objective

18  identified in a local plan, supporting land use and growth objectives established in

19  applicable federal, state, local, or tribal plans, and serving other national objectives, as

20  established in federal law, plans, or policies. *See also* AR 22836 at 22858.  The statute

21  authorizing the federal New Starts transportation program states that it is in the interest of

22  the United States to foster transportation systems that maximize safe, secure, and efficient

23  mobility of individuals, minimize environmental impacts, and minimize fuel

24  consumption.  49 U.S.C. § 5301(a).  That statute also states that one of the purposes of the

25  New Starts program is to provide financial assistance to state and local governments in

26  order to improve mobility for elderly and economically disadvantaged individuals.

27  § 5301(f)(4).

28

1    Providing high-capacity rapid transit in a specific congested corridor is an

2  objective meant to achieve a local transportation objective articulated in a local

3  transportation plan, consistent with SAFETEA-LU.  § 139(f)(3)(A).  Providing faster,

4  more reliable public transit and providing reliable service to the poor and elderly similarly

5  serves the goals of the New Start program.  § 5301(a), (f)(4).  Serving rapidly developing

6  areas of the study corridor supports a local growth objective.  23 C.F.R. § 139(f)(3)(B).

7  Finally, the provision of an alternative to private automobile travel arguably serves the

8  purpose of minimizing environmental impacts and fuel consumption.  § 5301(a).  Because

9  the statement of purpose and need did not foreclose all alternatives, and because it was

10  shaped by federal legislative purposes, it was reasonable.  Plaintiffs' argument to the

11  contrary is accordingly rejected.

12  **2.    Reasonable Alternatives**

13    An EIS must include a detailed statement on alternatives to the proposed action.

14  42 U.S.C. § 4332(2)(C)(iii).  The alternatives analysis "is the heart of the environmental

15  impact statement" and must "rigorously explore and objectively evaluate all reasonable

16  alternatives, and for alternatives which were eliminated from detailed study, briefly

17  discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14.

18    "In reviewing the sufficiency of an EIS, we employ 'a rule of reason' standard of

19  review 'that inquires whether an EIS contains a reasonably thorough discussion of the

20  significant aspects of the probable environmental consequences.'"  *Ilio'ulaokaokalani*

21  *Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006) (quoting *California v. Block*, 690

22  F.2d 753, 761 (9th Cir. 1982)) (additionally noting that this standard "is not materially

23  different than arbitrary and capricious review").  The agency must consider those

24  reasonable alternatives that are within the range dictated by the nature and scope of the

25  proposed action and sufficient to permit a "reasoned choice."  *Friends of Yosemite Valley*

26  *v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008).  The touchstone for this inquiry is

27  whether an EIS' selection and discussion of alternatives fosters informed decision-making

28

by the agency and informed public participation.  *Block*, 690 F.2d at 767.

There are some limits on an agency's duty to consider alternatives.  An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or inconsistent with its basic policy objectives.  *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996). There is no statutorily required minimum number of alternatives that must be considered and alternatives that do not advance the purpose of the project are not reasonable.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1148 (9th Cir. 2000).  There is also no need separately to analyze alternatives that are not significantly distinguishable from those already considered or which have substantially similar consequences.  *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990).

Plaintiffs challenge Defendants' assessment of reasonable alternatives under NEPA on a variety of grounds.  During the AA process, Defendants considered an improved bus system and the MLA, but rejected them as inconsistent with the purpose and need of the Project; those two options were therefore not carried over to the FEIS. AR 247 at 321-27.  As previously discussed, three fixed guideway routes and the no-build alternative were analyzed in the FEIS.  *Id.* at 331.  Plaintiffs argue that:  (1) it was improper to remove alternatives from consideration during the AA process; (2) the MLA was rejected based on bad data and would, in fact, meet the purpose and need of the Project; (3) alternate rail technologies, such as magnetic levitation, were erroneously excluded from consideration as reasonable alternatives in the FEIS; and (4) Defendants erroneously refused to consider a route that would not pass by the federal courthouse. Each of these claims is addressed below in turn.

### a.   Use of the AA Process to Screen Alternatives

Federal regulations require that federal agencies cooperate with state and local agencies to the fullest extent possible in order to reduce duplication between NEPA and

1   state and local requirements.  40 C.F.R. § 1506.2; *see also Laguna Greenbelt*, 42 F.3d at

2   524 & n.6.  A state-prepared AA can be used to comply with NEPA, as long as it meets

3   certain prerequisites, including that:  (1) the federal lead agency furnished guidance in the

4   AA's preparation and independently evaluated the document, 23 U.S.C. § 139(c)(3); and

5   (2) the AA was conducted with public review and a reasonable opportunity to comment,

6   23 C.F.R. § 450.318(b)(2)(ii)-(iii); *see also* AR 22836 at 22850 (AA result must be

7   subject to public review and comment during the scoping of the EIS).  A satisfactory AA

8   can be used to screen preliminarily and eliminate unreasonable alternatives.  23 C.F.R. §

9   450.318(a), (d); *see also* 23 C.F.R. Pt. 450 App'x A at 12 ("Alternatives passed over

10  during the transportation process because they are infeasible or do not meet the NEPA

11  'purpose and need' can be omitted from the detailed analysis of alternatives in the NEPA

12  document, as long as the rationale for elimination is explained in the NEPA document.").

13       Plaintiffs argue that the AA used to eliminate the MLA from further consideration

14  was inadequate, because it was not supervised by the FTA and because it was not subject

15  to public comment.  The record belies both of these assertions.  There are a number of

16  documents that indicate that the FTA played an active role in shaping, overseeing, and

17  approving the AA.  *See* AR 30 at 33 (ROD approval of AA); AR 150766 (internal FTA

18  discussion about AA logistics); AR 150107 (City representative wrote to FTA to check

19  about MLA's eligibility for federal funding); AR 150091 (FTA indicated that it would

20  review AA prior to publication).

21       There were also many opportunities for public comment on the alternatives

22  discussed in the AA.  *See* AR 247 at 296 (City Council considered over 3,000 comments

23  from the public on the AA before selecting the locally preferred alternative); AR 9434 at

24  9435 (AA states that City Council will conduct public hearings to solicit community

25  views on the evaluated alternatives), 9554 (AA notes that over 200 meetings were held

26  with members of the public while developing the AA); AR 16601 (AA Scoping Report

27  published prior to release of AA); AR 68621 (City Council held thirteen public meetings

28

where public comment was sought on the AA).

Although the 2007 NOI may have discouraged public comment on the alternatives that had already been considered and rejected in the AA, there was sufficient opportunity on the whole for public comment both before publication of the AA and during the City Council meetings following publication. AR 9696 at 9699 ("Other reasonable alternatives suggested during the scoping process may be added if they were not previously evaluated and eliminated for good cause on the basis of the Alternatives Analysis and are consistent with the project's purpose and need."); *see also* AR 17157 at 17172 (NEPA Scoping Report states that "[c]omments that focus on a preference for alternatives that have previously been evaluated and eliminated from consideration are included in the appendices to this report but are neither summarized nor considered."). Accordingly, use of the AA to remove alternatives from consideration was not contrary to the statute or the regulations. Plaintiffs' argument to the contrary is therefore rejected.

### b.   MLA

Plaintiffs argue that the MLA was excluded from consideration as a reasonable alternative based on improper use of a version of the proposal that was designed to fail to meet the purpose and need, in conjunction with bad data. They contend that Defendants used this version of the MLA as a "straw man" to make the rail alternative look more appealing. In essence, Plaintiffs argue that Defendants erred when they did not consider the exact version of the MLA proposed by HonoluluTraffic.com in the AA.

HonoluluTraffic.com made a number of comments along these lines throughout the administrative process. *See* AR 855 at 2018-31; AR 16601 at 16715-27; AR 17157 at 17223-27; AR 71958 at 71958-60. It complained that the cost estimates for the MLA in the AA were "preposterous" because they were seven times higher than a comparable three-lane expressway built in Tampa; it argued that a cost estimate of $900 million was more accurate. AR 17157 at 17223-27. HonoluluTraffic.com also asserted that the AA underestimated the number of riders that would use the MLA, "killed the MLA

advantage" by extending the expressway's length and allowing HOVs to use it for free, and erroneously concluded that the MLA would never be eligible for New Starts Funding. *Id.* Finally, HonoluluTraffic.com insisted that the AA should have considered a three-lane version of the MLA, not just a two-lane version, as well as additional ingress and egress options. *Id.*

In support of the assertions made in the HonoluluTraffic.com comment letters, Plaintiffs point to an open letter written by an official involved in the construction of the Tampa elevated expressway project. AR 17157 at 17245-48. The official alleged that Defendants had intentionally misrepresented the facts associated with the cost and operation of the Tampa project in order to obscure the possibility that the MLA could provide congestion relief in Honolulu. *Id.* Plaintiffs also cite to comments made by the Transit Advisory Task Force on the MLA. AR 70839 at 70878-79 (suggesting that Defendants explore new ingress and egress options on the MLA to alleviate congestion and explain why the zipper lane was discontinued in the AA design of the MLA). Finally, Plaintiffs cite to a number of comments made by FTA employees about the MLA. *See* AR 150902 (FTA employee informs City that MLA is eligible for federal-aid highway funding, but states, "I don't speak for FTA Region 9."); AR 151052 (FTA staff member states that the MLA was supported by the right milestones and methodology); AR 151149 (FTA staff member recommends that the MLA be considered in the DEIS); AR 151155 (FTA staff member writes that MLA appears to be reasonable on its face).

Defendants' decision to limit their analysis to the two-lane versions of the MLA explored in the AA did not violate "the rule of reason." Indeed, Defendants addressed the many design alterations suggested by Plaintiffs' comments and found that they were not substantial. AR 247 at 798-802 (explaining that there were no substantial differences between the alternative studied in the AA and the "ideal" managed lanes option that would have resulted in a different outcome); AR 855 at 2090 (response letter to HonoluluTraffic.com explaining that zipper lane was eliminated to increase capacity in

1   both directions and that all of the suggested changes to the MLA design would still not fix

2   the primary issue with the MLA, the performance of buses on local streets), 2092

3   (explaining that increasing the number of lanes in the MLA would not have relieved

4   congestion and would have increased cost).

5        Defendants also adequately defended their MLA cost estimates; the Transit

6   Advisory Task Force found that the Tampa project was not a good cost comparator

7   because of the many differences between the two projects, *see* AR 55308 at 55311, that

8   the cost estimates in the AA were "fair and accurate," and that the same costing

9   techniques were used to price all of the alternatives analyzed in the AA.  AR 855 at 2091.

10  It was not unreasonable for Defendants to refuse to reassess a new version of the MLA in

11  the FEIS, because there was no indication that the AA's assessment of the MLA was

12  inaccurate or that changes to the MLA design would have made a difference.  *See*

13  *Headwaters*, 914 F.2d at 1181 (no need to separately analyze alternatives that are not

14  significantly distinguishable from those already considered).  Accordingly, Plaintiffs'

15  claim that Defendants erred in refusing to consider MLA further is rejected.

16       **c.     Alternatives to Steel-Wheels-on-Steel**

17       Plaintiffs also argue that Defendants failed to consider reasonable alternative

18  technologies in the FEIS, including light-rail, monorail, magnetic levitation, and rubber-

19  tired rail.  These technologies were excluded from further consideration by a panel of

20  experts during the DEIS scoping process, in favor of steel-on-steel technology.  Plaintiffs

21  complain that the panel of experts made their decision without proper public input and

22  based on concerns such as cost, performance, and reliability, rather than the

23  environmental advantages and disadvantages of each technology.

24       Defendants defend their decision to exclude alternate rail technologies on the basis

25  that all five technologies were essentially environmentally equivalent, and an EIS need

26  not consider indistinguishable alternatives.  *See Headwaters*, 914 F.2d at 1181.  There is

27  evidence in the record that indicates that the panel of experts considered the

28

environmental effects of the various technologies, including air pollution, energy use, and noise impacts. AR 55188 at 55189 (panel reports that it concluded that steel wheel technology has noise impacts comparable to other technologies, better energy efficiency, and lower air quality impacts than the other four options).

In the FEIS, Defendants explained that the alternate rail technologies were eliminated because they are proprietary and did not offer substantial proven performance, cost, and reliability benefits compared to steel-on-steel technology. AR 247 at 790-91; *see also* AR 9319 (steel wheel technology is reliable, safe, high speed, and non-proprietary). The FEIS noted further that magnetic levitation is unproven for general use and that steel wheel systems can be designed to match the noise levels of magnetic levitation systems when in operation. *Id.*; *see also* AR 855 at 1803-04 (City letter explains that there is only one magnetic levitation system operating in the world, that it would require more energy and block more views, and that other systems can be designed to match its noise level); *but see* AR 22575 at 22682 (raw numbers indicating that magnetic level noise levels are lower before mitigation).

Neither the panel of experts nor the FEIS included a side-by-side comparison of the environmental effects of the various technologies, to make clear to the public which technologies provided the most environmental benefit. *See Block*, 690 F.2d at 767 (the touchstone for NEPA review is whether an EIS' selection and discussion of alternatives fosters informed decision-making by the agency and informed public participation). It is nevertheless clear that there were extensive opportunities for public comment on the various proposed rail technologies. *See* AR 247 at 283 (FEIS describes scoping process); AR 855 at 1803-04 (letter from City noting that public comments on each technology were accepted); AR 17157 at 17160-61 (NEPA scoping report describes public comments received at scoping meetings and in writing).

Because Defendants have presented adequate evidence that the environmental advantages of each technology were considered by the panel, and have shown that the

- 38 -

1   public had ample opportunity to comment, their decision to exclude alternate rail

2   technologies from the FEIS was not arbitrary and capricious.

3           **d.      Alternatives to Route Past Courthouse**

4           Finally, Plaintiffs argue that Defendants failed to consider reasonable alternatives

5   to a route running past the federal courthouse because such routes would require approval

6   from the City Council.  For support, Plaintiffs rely on a letter written by locally-based

7   federal judges expressing their concern about the positioning of the rail project past the

8   courthouse.  AR 855 at 930-34.  Plaintiffs claim that the letter states that the judges spoke

9   to the Chief of the City's Rapid Transit Division, who told them that alternative

10  alignments were unlikely to be considered *because* they would require the approval of the

11  City Council.  In fact, the judges' letter states that the Chief said he did not feel there are

12  any viable alternatives *and* that any change would require City Council approval.  *Id.*

13  There is nothing in the record to indicate that Defendants ever decided not to evaluate

14  alternate routes because they wanted to avoid the need for City Council approval.  *See,*

15  *e.g.*, AR 855 at 937-38 (City letter in response to federal judges' letter explaining why the

16  alignment had been selected).  Plaintiffs' claim is unsupported by the record and is,

17  therefore, rejected.

18  **3.      Analysis of Environmental Consequences**

19          An EIS must contain a "reasonably thorough discussion" of a project's

20  environmental consequences and mitigation measures.  *Nat'l Parks & Conservation*

21  *Ass'n*, 606 F.3d at 1072-73; *see also* 42 U.S.C. § 4332(2)(C).  The EIS must discuss the

22  project's direct effects and reasonably foreseeable indirect and cumulative effects,

23  including growth-inducing effects.  40 C.F.R. § 1502.16.  However, an EIS need not

24  discuss speculative consequences or discuss every conceivable environmental impact.

25  *Ground Zero Ctr. for Non-Violent Actions v. U.S. Dep't of the Navy*, 383 F.3d 1082,

26  1089-90 (9th Cir. 2004).  While the EIS must discuss mitigation in some detail, a

27  complete mitigation plan is not necessary.  *Robertson v. Methow Valley Citizens Council*,

28

490 U.S. 332, 352 (1989).

A court's review of the discussion of environmental consequences in an EIS is limited to assessing whether the EIS includes a "hard look" at the environmental impacts of the proposed action. *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1072. This requires a pragmatic judgment about whether the form, content and preparation of the EIS foster informed decision-making and informed public participation. *Id.*

Plaintiffs argue that the FEIS does not sufficiently examine the foreseeable environmental consequences of the Project because: (1) it does not account for potential impacts on air quality associated with fabricating and installing the guideway and transporting materials to the areas where the guideway will be built; and (2) it fails to account for the indirect and cumulative effects on land use and growth that will occur along the rail line and does not explain whether there are sensitive environmental resources that could be affected in those areas.

As to the first argument, Defendants gave the requisite "hard look" to the environmental consequences that could result from construction in the FEIS. *See* AR 247 at 551-54 (describing air pollutant emissions that will occur due to the project), 640-41 (describing effects of the construction phase), 645 (explaining that air pollution effects from construction will be limited to short-term increases in fugitive dust and airborne particulate matter and mobile-source emissions, and identifying mitigation measures). Accordingly, Plaintiffs' argument to the contrary is rejected.

As to the second, it is not entirely clear what specific environmental resources Plaintiffs contend will be threatened by the growth-inducing effects of the Project, but it is plain that Defendants also gave the required "hard look" at this issue. *See* AR 247 at 656 (noting that future development will be greatly influenced by factors outside of the control of Defendants), 657 (explaining that the project will not affect regional population, but will influence distribution and intensity of development in the study corridor and away from the less developed, more environmentally-sensitive areas of

Oahu), 672 (observing that the project is being built in an urbanized environment that will remain urbanized in the future and that the project could result in the preservation of a larger volume of undisturbed land outside of the project corridor, which would benefit ecosystems), 673 (analyzing the direct, indirect, and cumulative impacts of the project on water, street trees, and archaeological, cultural, and historic resources).  This argument is therefore rejected as well.

**4.    Segmented Analysis**

Plaintiffs claim that Defendants improperly segmented their NEPA analysis by preparing an FEIS for the rail project, which will run from Kapolei to Ala Moana Center, without also including environmental analysis of the impacts of planned extensions of the rail project between Ala Moana Center, and UH and Waikiki.  Federal regulations provide that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."  40 C.F.R. § 1502.4(a).  This includes connected actions, cumulative actions, and similar actions, as defined in 40 C.F.R. § 1508.25(a).  Federal regulations further specify that an action assessed in an EIS dealing with a transportation improvement shall: (1) connect logical termini and be of sufficient length to address environmental matters on a broad scope; (2) have independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no further improvements in the area are made; and (3) not restrict consideration of alternatives or other reasonably foreseeable transportation improvements.  23 C.F.R. § 771.111(f).

Plaintiffs assert that the Kapolei to Ala Moana rail line and the Ala Moana to UH/Waikiki rail line are "connected actions."  Actions are connected if they automatically trigger other actions which may require an EIS, cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for their justification.  § 1508.25(a)(1).  Plaintiffs insist that the rail project was always intended to extend to Waikiki, and that the

1  segmentation of the project into smaller sections was an attempt to avoid analyzing

2  environmental impacts to areas beyond the Ala Moana Center.  *See* AR 9556 at 9566-68

3  (describing need for better rapid transit service to Waikiki, as a tourist center, and UH);

4  AR 9696 (2007 NOI states that Defendants intend to prepare an EIS on a project running

5  from Kapolei to UH and Waikiki); AR 9700 (2005 NOI states that travel corridor extends

6  from Kapolei to UH and Waikiki).; AR 72134 at 72137 (letter from two City

7  Councilmembers suggesting that the branch to Waikiki was intentionally left out of the

8  DEIS to avoid addressing negative environmental impacts).

9       The Ninth Circuit applies an "independent utility" test to determine whether

10  multiple actions are so connected as to mandate consideration in a single EIS.  *Great*

11  *Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006).  The court asks whether

12  each of the two projects would have taken place with or without each other and thus have

13  independent utility.  *Id.*  A number of Ninth Circuit cases have applied this test.  *See, e.g.,*

14  *id.* (concluding, in a challenge to two RODs, that the two projects were interdependent

15  and therefore should have been assessed together); *Wetlands Action Network v. U.S. Army*

16  *Corps of Eng'rs*, 222 F.3d 1105, 1112 (9th Cir. 2000), *abrogated on other grounds by*

17  *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1176-78 (9th Cir. 2011) (en banc),

18  (finding, in challenge to a single permit issuance, that permitted project had independent

19  utility because it did not depend on completion of later, not-yet-permitted phases of the

20  project); *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985) (finding that an EA

21  approving new road was improperly segmented when the EA did not consider the impact

22  of timber sales that were the sole reason for building the road).

23       The rail project as defined in the FEIS, running from Kapolei to the Ala Moana

24  Center, satisfies the independent utility test.  While it is true that future extensions to

25  Waikiki and UH may not have independent utility, Plaintiffs' challenge is not to an EIS

26  dealing with those extensions and so the court need not address the independent utility of

27  speculative future developments.  The record amply supports the conclusion that the route

28

in the FEIS will serve a purpose even if the proposed extensions are never built.  AR 247 at 791 (FEIS explaining that planned extensions were not included because no funding had been identified for them, but that the rail project had logical termini and independent utility from any extensions that may be constructed in the future); AR 9556 at 9568 (Ala Moana Center is served by more than 2,000 weekday bus trips and visited by more than fifty-six million shoppers annually).  While the existence of the Project may strongly influence future decisions about whether an elevated rail line is built from Ala Moana to Waikiki and UH Manoa, the construction of an extension is not a foregone conclusion. Plaintiffs' argument that the NEPA analysis was impermissibly segmented is accordingly rejected.[7]

## C.   NHPA

        Plaintiffs argue that Defendants have failed to meet their duty to assess the indirect effects that historic resources other than Chinatown and Merchant Street located near the rail stations will suffer due to the project.  The NHPA requires agencies to assess whether historic properties will suffer adverse effects, which occur when an undertaking may alter, directly or indirectly, any of the characteristics that qualify a property for inclusion in the National Register.  36 C.F.R. § 800.5(a)(1).  The agency must then consult with relevant parties to develop and evaluate alternatives and modifications to the undertaking that could avoid, minimize, or mitigate those adverse effects.  36 C.F.R. § 800.6(a); *Muckleshoot Indian Tribe*, 177 F.3d at 805 (observing that § 106 is a "stop, look, and listen" provision requiring agencies to consider the effects of their programs).  A PA can serve as evidence of the agency's compliance with these requirements.  36 C.F.R. § 800.6(c).

_____

        [7]     Defendants contend that the FEIS did, in fact, analyze impacts of future extensions to Waikiki and UH.  There is some evidence in the record to support this contention.  *See* AR 247 at 554-64, 655; AR 33642 at 33654. There is, however, no need to decide that question at this time.

- 43 -

A review of the entire record reveals that Defendants sufficiently assessed the harm that rail station-induced growth could cause to historic sites near rail stations and set up a number of mitigation measures to deal with such effects.  *See* 247 at 657-59 (recognizing that the project may increase the density of development near stations); AR 30 at 103-04 (PA providing that the City shall employ a architectural historian who shall monitor the integration of transit-oriented development and historic preservation in the vicinity of project stations), 104 (City shall monitor proposed demolition of resources built before 1969 within a 2,000 foot radius of each station), 105 (provides for meeting with consulting parties to discuss next steps if a significant adverse indirect or cumulative effect occurs to a historic resource).  Defendants have therefore satisfied their duty to consult with the SHPO and to develop alternatives to mitigate possible adverse effects on historic properties.  Accordingly, Plaintiffs' NHPA claim is rejected.  *See Tyler v. Cuomo*, 236 F.3d 1124, 1129 (9th Cir. 2000).

**III.    Conclusion and Remedy**

For the reasons set forth above:

**A.**    The Court grants Plaintiffs' Motion for Summary Judgment (Doc. 109) with respect to: (1) their Section 4(f) claims that Defendants arbitrarily and capriciously failed to complete reasonable efforts to identify above-ground TCPs prior to issuing the ROD; (2) Defendants' failure adequately to consider the Beretania Street Tunnel alternative prior to eliminating it as imprudent; and (3) Defendants' failure adequately to consider whether the Project will constructively use Mother Waldron Park.

**B.**    The Court grants Defendants' Motion for Summary Judgment (Doc. 145) with respect to all other claims raised in said motion.

**C.**    The Court does not enter a final judgment and/or a permanent injunction at this time.  While an injunction may be appropriate in this case, issuance of an injunction does not automatically follow, nor do the terms of any such injunction.

1    *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842 (9th Cir. 2007).  Traditional

2    standards of equity still govern.  *Id.*; *Weinberger v. Romero-Barcelo*, 456 U.S. 305

3    (1982) (sustaining district court's refusal to enjoin Navy's violations of Federal

4    Water Pollution Control Act where the district court, instead, ordered the Navy to

5    apply for a permit).  Even assuming the issuance of an injunction is appropriate, it

6    must be carefully tailored to provide a balanced remedy.  *See Idaho Watersheds*

7    *Project v. Hahn*, 307 F.3d 815, 833-34 (9th Cir. 2002), *abrogated on other*

8    *grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

9      To achieve these ends, the court invites briefing on whether a permanent

10   injunction and/or a declaratory judgment should issue, and the scope of any such

11   equitable relief, in order properly to assess the balance of equities between the

12   parties, as well as where the public interest lies.  To afford the parties the

13   opportunity to brief and argue these issues, concurrently with this Order, the Court

14   is issuing a Scheduling Order re Remedy

15   **IT IS SO ORDERED.**

16   Dated this 1st day of November, 2012.

17             */s/ A. Wallace Tashima*
           A. WALLACE TASHIMA

18              United States Circuit Judge
           Sitting by Designation

- 45 -